Law Office of Denise Lanchantin Dwyer LLC
5 Duxbury Court Princeton Junction, New Jersey 08550-2137
Tel. 609-632-0475
Fax 609-632-1255
e-mail Denise@DLDwyerLaw.com
Attorney ID #009852005
Attorney for Plaintiff

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| A.C., individually and on behalf of Z.P., ) | **Civil Action No.:** |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| WEST WINDSOR-PLAINSBORO ) | |
| REGIONAL BOARD OF EDUCATION; ) | |
| NEW JERSEY DEPARTMENT OF ) | |
| EDUCATION; ANGELICA ALLEN- ) | |
| MCMILLAN, Acting Commissioner of ) | |
| Education, in her official capacity, ) | |
| ) | |
| Defendants. ) | |
| ) | |

Plaintiff, A.C., ("Parent"), individually and on behalf of her minor son, Z.P. by way of this Complaint in appeal of a decision of the Office of Administrative Law and assertion of related causes of action against West Windsor-Plainsboro Regional Board of Education; "District"); New Jersey Department of Education ("NJDOE"); and Angelica Allen-McMillan, Acting Commissioner of Education, in her official capacity, states:

**NATURE OF THE ACTION**

1.    This Complaint seeks relief for a denial of rights under the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1400 *et seq*.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); New Jersey's Special Education Law, N.J.S.A. § 18A:46-1, and the implementing federal and state regulations, as well

-1-

as violations of Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.).*

2.     The Parent has filed this action seeking an Order reversing the March 30, 2021 final[1] decision of the Hon. Carl V. Buck, III ALJ, in an action entitled *A.C. on behalf of Z.P. v. West Windsor-Plainsboro Regional Board of Education*, OAL Dkt. No. EDS 07748-19, Agency Dkt. No. 2019-30069, in which ALJ Buck concluded that the District's determinations in January 2019 and May 2019 that Z.P. was not eligible for special education programs and services were not a denial of a free appropriate public education ("FAPE"); and that the August 2019 and December 2019 Individual Education Programs ("IEPs") developed and implemented by the District provided Z.P. a FAPE.

3.     The Parent seeks an Order entering Judgment against Defendant West Windsor Plainsboro Regional Board of Education based on the administrative record developed in the Office of Administrative Law ("OAL") declaring and adjudging that as of his third birthday, Z.P. was eligible for special education and related services and entitled to a FAPE that is commensurate with the recommendations of Amanda E. Bennett, M.D., M.P.H. and her team at the Autism Integrated Care Program at the Children's Hospital of Philadelphia, ("CHOP"), Debra H. Levin, M.A., CCC-SLP, and Lindsay Hilsen, Ed.D., BCBA-D.

4.     The Parent has exhausted her administrative remedies because her request for an impartial due process hearing sought *inter alia,* an evaluation for eligibility for special education and related services, a determination that Z.P. was eligible, and development and implementation

---

[1] Although ALJ Buck refers to it on page 4 of his opinion as an "initial decision," special education decisions following a due process hearing in New Jersey's Office of Administrative Law are final under 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. § 300.514.

of an IEP designed to meet his unique needs that was commensurate the recommendations of the aforementioned experts.

5.      The IDEA requires NJDOE, as the State Educational Agency ("SEA") under 20 U.S.C. § 1415(a), to "establish and maintain procedures… to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education…."

6.      Regulations enacted by the NJDOE pursuant to the IDEA guaranteed the Parent and Z.P. a timely and an impartial due process hearing.  N.J.A.C. 6Al14-2.7.  NJDOE has failed to exercise its oversight responsibility, which resulted in the Parent and Z.P. being deprived of their right to a timely and impartial due process hearing.  It took 660 days for Parent to obtain a final decision on her due process petition.  Further, the Parent was deprived of her right to an impartial due process hearing as evidenced by the ALJ's 52-page decision, which contains more than 40 pages that are a verbatim recitation (inclusive of typographical errors) of Defendant West Windsor Plainsboro Regional Board of Education's post hearing brief.  The Parent and Z.P. have been harmed by the manifest injustice occasioned upon them as a result of the NJDOE's failure to properly exercise its supervisory authority to ensure that the Parent and Z.P. received the timely and impartial due process hearing to which they were entitled.

## **JURSIDICTION AND VENUE**

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. 1415(i)(2) on the grounds that this action arises under the laws of the United States, including 20 U.S.C. § 1400 *et seq*. and 29 U.S.C. § 794.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that all parties reside within this judicial district and the events giving rise to the federal claims set forth herein occurred within this judicial district.

## PRELIMINARY STATEMENT

9. The IDEA contains comprehensive procedures devised to ensure that children with disabilities are promptly identified, evaluated, determined eligible for special education and related services, and that an IEP designed to meet the child's unique needs is developed and implemented. That detailed scheme includes procedural safeguards for prompt resolution of disputes that inevitably arise between families and school districts.

10. Three legal requirements control in this matter: (i) school districts are obligated to follow the IDEA's procedures which are constructed to provide children with disabilities aged three to twenty-one a FAPE; (ii) school districts must provide an appropriate program and safe learning environment, so that children with disabilities can make progress in light of their individual circumstances; and (iii) a child's educational performance includes more than his cognitive abilities.

11. The final administrative decision in this matter does not meet any of those standards and must be reversed and was issued 144 days after the record closed.

12. The ALJ's opinion fails to consider large amounts of non-testimonial evidence the Parent submitted and provides no rationale for his findings regarding all testimonial evidence. The vast majority of the opinion was copied nearly verbatim from the District's post-hearing brief including many non-sequiturs, incomplete sentences, grammatical errors and obvious typographical errors.

13.     Although the ALJ concludes that "school personnel testified persuasively as to Z.P.'s progress and the burden of proof and production rests with the Board", the findings of fact in the opinion are never connected to elements the District needed to prove in order to sustain its burden of proof and production during the due process hearing.  Many of the ALJ's purported "factual findings" were inconsistent with the documentary record entered into evidence at the hearing as well as by testimony and extrinsic evidence presented by the Parent that the ALJ simply failed to consider.

## THE PARTIES

14.     Plaintiff A.C. is the mother of Z.P., a now five-year-old student with multiple diagnosed disabilities who is eligible for special education and related services under the IDEA.

15.     Z.P.  is also eligible for services and protection under Section 504 because he is an "individual with a disability" who is "otherwise qualified" for special education and related services and education in the least restrictive environment.  Z.P.'s disabilities substantially impair him in major life activities including, but not limited to, communication, socializing, regulating emotions, and focusing.  Under Section 504, Z.P. is entitled to an equal opportunity to access the benefits of services offered by the District as other students who are not disabled.

16.     Z.P. resides with his mother, A.C. in the area served by the West Windsor-Plainsboro Regional Board of Education.

17.     Defendant West Windsor-Plainsboro Regional Board of Education is the Local Educational Agency ("LEA") as defined by 20 U.S.C. § 1401(a).

18.     Defendant West Windsor-Plainsboro Regional Board of Education is a recipient of federal funds for the provision of special education programs and services pursuant to 20 U.S.C. §1400 *et seq.*

19.    West Windsor-Plainsboro Regional Board of Education has its principal place of business at 321 Village Road East, West Windsor Township, Mercer County, New Jersey.

20.    Defendant New Jersey Department of Education is a State Educational Agency as that term is defined in 20 U.S.C. § 1401(32); 34 C.F.R. § 300.41; and a "public entity" as that term is defined in 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104; and otherwise receives federal funds for special education under various federal statutes, and as such, is responsible for establishing and maintaining a system for resolution of disputes and ensuring compliance with all mandates arising under the numerous federal statutes for providing special education through its Office of Special Education Programs ("OSEP").

21.    NJDOE has its principal place of business at 100 River View Plaza, Trenton, Mercer County, New Jersey.

22.    Angelica Allen-McMillan, Acting Commissioner of Education, is the state officer in charge of the NJDOE.

23.    Acting Commissioner Allen-McMillan is named herein in her official capacity.

## PROCEDURAL HISTORY

24.    On February 21, 2019, the Parent filed a Request for Mediation/Petition for Due Process seeking to have Z.P. evaluated by the District for eligibility for special education and related services.

25.    The Petition was withdrawn without prejudice after the District agreed to conduct an evaluation which took place on March 27, 2019, and April 3 and 5, 2019.

26.    At an eligibility determination meeting held on May 24, 2019, the District's Child Study Team ("CST") determined that Z.P. did not have a disability that adversely affects his

educational performance, but failed to give the Parent the required notice that they found him ineligible for special education and related services at that time.

27.    On May 29, 2019, the Parent filed a second petition for Mediation/Petition for Due Process asking that Z.P. be deemed eligible for special education and related services and alleging that the District had violated the IDEA and the ADA.

28.    On June 20, 2019, the parties appeared at the OAL for a settlement conference with the Honorable Dean J. Buono, A.L.J.  At that time, the District agreed to reconsider its eligibility determination by conducting a second observation of Z.P. at the daycare facility where he participated in a preschool class.  The parties consented to an adjournment to attempt to settle the matter, and ALJ Buono retained the matter.

29.    ALJ Buono advised the parties at the June 20, 2019 conference that the first dates available in the OAL for a hearing were not until March 2020.

30.    On August 8, 2019, the District found Z.P. eligible for special education and related services under the classification category of Preschool Child with a Disability and proposed an IEP of the same date.

31.    On August 14, 2019, the Parent provided her written consent for the proposed IEP to be implemented with her handwritten notation, "however, I disagree with the denial of speech services."

32.    Due to the continued disagreement over the provision of speech-language services, the parties did not reach a settlement and the matter was assigned to the Honorable Carl V. Buck, III, A.L.J. in September 2019 for an impartial due process hearing on March 10, 18, and 19, 2020. These dates are nine months after NJDOE transmitted the matter to the OAL.

33.    On October 1, 2019, the parties appeared for an initial status conference before ALJ Buck.  The District argued that the matter should be dismissed as moot, and the Parent responded that the failure to provide speech-language services denied Z.P. a FAPE and that issue remained a judiciable controversy.

34.    At that conference, the District tried to demonstrate that Z.P. did not require speech-language services by producing a statement from his special education teacher, who is not a speech-language therapist.  Despite having multiple speech-language evaluation reports less than a year old, the District pressed for another speech-language evaluation.  Eventually, the parties agreed that the District would conduct a speech-language screening of Z.P. within thirty (30) days.

35.    Before the screening was complete, Z.P. had several behavioral outbursts at school that resulted in him being removed from class, including one in which he was physically restrained. The Parent asked the case manager to develop a Behavioral Intervention Plan ("BIP"), but the case manager refused.

36.    On or about November 11, 2019, the Parent filed a request for emergent relief, seeking an order requiring the District to immediately provide Z.P. speech-language services and develop a BIP after Z.P. was physically restrained at school.

37.    The District filed a cross-motion to compel consent for a full speech-language evaluation.

38.    ALJ Buck held oral argument on the motions on November 27, 2019, the day before Thanksgiving.  The parties agreed to postpone a decision on the emergent relief motion for thirty days after the District made it clear that it would not make any changes to Z.P.'s IEP unless it was permitted to do its own complete speech-language evaluation.  The Parent consented to the evaluation, and the ALJ scheduled a teleconference for December 12, 2019.

39.    The District would also not agree to bring in a board certified behavior analyst ("BCBA") to assess the reasons for Z.P.'s maladaptive behavior, so the Parent retained a private BCBA to observe Z.P. in school.

40.    The December 12th teleconference was adjourned until the 18th, because the District had not completed its speech-language evaluation and convened an IEP meeting as agreed. At an IEP meeting on December 16, 2019, the District agreed to begin speech services after the winter break, only for articulation, but still refused to develop a BIP.

41.    ALJ Buck issued a pre-hearing order on December 26, 2019.

42.    On January 27, 2020, after the private BCBA the Parent retained had observed Z.P. in school and issued a preliminary report stating that a formal behavior plan was warranted, the ALJ held another status teleconference with counsel. The District's counsel advised that the District continued to refuse to develop a BIP for Z.P. or to provide additional speech-language therapy beyond articulation. The Parent's counsel continued to raise issues contained in the emergent relief motion, but the ALJ never made a ruling on the motion, and no BIP was ever developed.

43.    During the January 27, 2020 teleconference, A.C.'s counsel advised that the Parent wished to be permitted, under N.J.A.C.6A:14-2.7(i), to amend the petition that was originally prepared and filed *pro se* by A.C.

44.    An amended petition for due process was filed on January 30, 2020 seeking findings:

> i.    that the District's failure to timely and appropriately identify, evaluate, and find Z.P. eligible for special education and related services and to develop and implement an IEP tailored to meet his unique needs no later than his third birthday denied him a FAPE;

ii. that the District denied Z.P. a FAPE by failing to provide him needed transportation services and that that failure unreasonably exposed Z.P. to serious harm in violation of the IDEA, Section 504, and the ADA;

iii. that as a result of the District's failures, Z.P. is entitled to compensatory educational services including, but not limited to, behavioral interventions and speech-language therapy;

iv. that the District is obligated to reimburse the Parent any costs incurred for privately-obtained preschool services beginning on Z.P.'s third birthday through the date he was found eligible for special education; and reimbursement for costs incurred for privately-obtained speech-language therapy from Z.P.'s third birthday to the present;

v. that Z.P. requires speech-language services in the areas of grammatical/morphological complexity, phonological development, social communication skills as well as for articulation, and that such services together with appropriate goals and objectives must be included in his IEP; and

vi. that Z.P. requires an individualized behavior intervention plan included in his IEP.

45. On February 12, 2019, the District filed a Motion to Dismiss the Amended Petition.

46. At a status conference on February 13, 2019, the ALJ advised the parties orally he would accept the amended petition, but never made a formal ruling on the motion.

47. The matter was originally scheduled to be heard on March 10, 18, and 19, and April 21, 2020. In an attempt to resolve the matter, the March 10, 2020 hearing date was converted into a settlement conference.

48.    Due to the COVID-19 pandemic, the March and April hearing dates were canceled. The parties agreed the hearing would proceed via ZOOM, and the hearing was held on May 21, June 15 and 17, July 2, 17, and 20, and August 7, 2020.

49.    On September 1, 2019, after the hearing concluded but before the post-hearing briefs were due, the Parent filed another motion for emergent relief because the District was refusing to reenroll Z.P. in school even though the Parent had never withdrawn him, and the District had proposed and the Parent consented to an IEP for the 2019-2020 school year.

50.    ALJ Buck held several telephone conferences about the refusal to reenroll Z.P., but never made a ruling, and Z.P. missed the first two days of the school year as a result of being disenrolled.

51.    The District submitted a post-hearing brief dated October 14, 2020, the Parent submitted a post hearing brief dated October 19, 2020 and the record closed on November 7, 2020.

52.    On March 30, 2021, one hundred and forty-four (144) days after the record closed, ALJ Buck issued a final decision and Order that denied the Parent's requested relief except with regard to the transportation issue where, without referring to any of the documents entered in evidence, he granted the relief requested, "to the extent that this issue has not been adequately dealt with by the district and a revised analysis of Z.P.'s diagnosis of allergy and asthma shall be re-undertaken to determine his appropriate transportation needs."

## STATEMENT OF FACTS RELEVANT TO ALL COUNTS

53.    Z.P. was born on March 22, 2016.

54.    Z.P. has been diagnosed with multiple disabilities including: Autism Spectrum Disorder ("ASD"); Mixed Expressive/Receptive Language Disorder; Childhood Behavioral Insomnia; Attention Deficit Hyperactivity Disorder; and High Risk for Elopement.  He also suffers

from life-threatening asthma and food allergies which have resulted in him having to be hospitalized multiple times since birth.

55.    The diagnoses of ASD, Mixed Expressive/Receptive Language Disorder, Childhood Behavioral Insomnia, asthma and food allergies were all prior to Z.P. turning three years old and were known to the District in January 2019.

**Z.P.'s Early Intervention Services**

56.    The Parent discussed concerns she had about Z.P.'s delayed development, in particular his slow language development, with his pediatrician who then referred him to Early Intervention Services ("EI") on his second birthday.

57.    Z.P. was evaluated, identified as eligible, and began receiving EI services in March 2018 under an Individualized Family Service Plan ("IFSP") due to his developmental delays.

58.    From March 2018 to March 2019, Z.P. received EI services four times per week consisting of one speech-language therapy session, one occupational therapy session, and two developmental intervention sessions.  The latter intervention works on social, emotional, and behavioral skills.

59.    These services were provided both in his home and in the community as well as the daycare center Z.P. attended.

60.    In early October 2018, Z.P.'s EI service coordinator scheduled a Transition Planning Conference with the District to facilitate Z.P.'s consideration for eligibility as a preschool child with a disability when he turned three years old.

61.    Dr. Laura Nash, a District school psychologist who became Z.P.'s case manager, attended the conference at the family's home in late October 2018.

62.  The Parent made the case manager aware of her concerns, specifically Z.P.'s speech development, as well as his ability to follow directions and his lack of coping skills.

63.  EI therapy notes from October 2018, introduced into evidence as J-1, documented Z.P.'s inconsistent behaviors and frequent tantrums during his developmental intervention sessions as well as the sensory techniques, such as log roll, blanket burrito, and squishes, the therapist used to help Z.P. calm down and regulate his behavior.

64.  EI goals for Z.P. at the time included eye contact, following directions, and using sensory strategies to regulate his body during play and communication.

65.  At the conference, the case manager advised the Parent that the District would schedule an identification/evaluation planning meeting closer to Z.P.'s third birthday.

**Z.P.'s Private Evaluations at Children's Hospital of Philadelphia ("CHOP")**

66.  On December 4, 2018, Z.P. was evaluated at CHOP's Division of Developmental and Behavioral Pediatrics by Amanda E. Bennett, M.D., M.P.H., a board-certified developmental pediatrician, and the Clinical Chair of the Autism Integrated Care Program at CHOP and her team, which included a speech-language therapist.

67.  At the time, Dr. Bennett recorded Z.P. as "a 2-year 8-month male with history of speech delay" and "parental concerns of speech delay, poor attention/hyperactivity, and sensory issues." Dr. Bennett's report was entered into evidence as J-2.

68.  Over the course of four hours, Z.P. underwent a medical evaluation, a speech-language evaluation and team observation after which Dr. Bennett diagnosed Z.P. with Autism Spectrum Disorder, Mixed Receptive-Expressive Language Disorder, and Behavioral Insomnia of Childhood.

69. Dr. Bennett's report contained several recommendations including a having Z.P. attend a full-time autism integrated preschool program when he turned three, and continuing speech-language therapy to address his communication skills.

70. An integrated program is one in which students with disabilities are educated alongside their general education peers.

71. Jennifer Moore, a speech-language pathologist at CHOP, administered the Preschool Language Scale-5th Edition (PLS-5) to assess Z.P.'s speech-language skills and her report was in evidence at the hearing as J-3.

72. While Z.P. obtained scores in the average range in Auditory Comprehension and Total Language Score, his score in Expressive Communication was only at the 18th percentile.

73. In her report, Ms. Moore stated that the reported standard scores should be interpreted with caution. Some of the reasons Ms. Moore advised caution included:

a) Z.P.'s scores appeared to be inflated by his use of repetitive, echolalic utterances and his relative strength in rote, structured skills.

b) Z.P.'s language profile was characterized by scattered skills, which also contributed to his inflated scores.

c) Z.P. was able to complete more advanced language tasks but did not demonstrate many earlier developing skills at or below his age level.

d) She noted "significant qualitative deficits" throughout the session.

74. Ms. Moore noted Z.P. exhibited "an atypical language profile, as children are expected to gain language in a linear and predictable manner."

75. Ms. Moore concluded his pragmatic language (i.e., use of language for social purposes) was also atypical.

76.     Ms. Moore's report listed a number of communicative disruptions that included but were not limited to reduced eye contact, reduced social initiative. limited variation of facial expression, inconsistent response to name, limited attention to a communication partner, limited use of gestures and other nonverbal strategies for communication.

77.     The combination of an Autism Spectrum Disorder diagnosis and the results of the speech-language evaluation report clearly demonstrated that Z.P. was a "child between the ages of three and five who has an identified disabling condition…that adversely affects learning or development and who requires special education and related services," the eligibility criteria of a preschool child with a disability in New Jersey's Administrative Code at N.J.A.C. 6A:14-3.5(c)(10).

78.     Ms. Moore's report stated that "classroom-based services will be most appropriate for Z.P." as he transitions from EI because "(t)he classroom setting will provide the most naturalistic integration of communication and social communication skills with peers."

**Z.P.'s Performance at Bright Horizons Daycare**

79.     At this time, December 2018, Z.P. was attending a full day childcare program at Bright Horizons in West Windsor Township.

80.     Z.P.'s teachers at Bright Horizons noted many of the same issues seen by the experts at CHOP.

81.     In a letter dated December 5, 2018, and entered in evidence as J-5, Ingrid Sparv Oehlke, Z.P.'s teacher in the two-year olds' class, wrote that when Z.P. came to her classroom in June 2018, "he struggled with many socioemotional areas, such as interacting with peers, following classroom routines etc., as well as communication" and provided the following observations of Z.P.:

a) Z.P. had a tendency to resort to being physically aggressive (hitting, pushing, and throwing) and in the beginning this seemed to be his main way of expressing himself.

b) It seemed like (and still does) that he would only get physical or frustrated when he had trouble communicating or he felt like he wasn't being heard/understood.

c) Z.P. still struggle(d) with communicating.

d) Z.P. seem(ed) to have most success with individual activities and loves having one on one time with a teacher,

82. Her letter also noted Z.P.'s great strengths in math and literacy.

83. The Parent provided copies of the CHOP Autism Evaluation Report, the CHOP Speech Evaluation Report and the teacher's letter to the District on or about December 11, 2018 in advance of a meeting with the District scheduled for January 15, 2019.

**The First Time The District Refuses To Evaluate Z.P.**

84. On January 15, 2019, the District convened the first Initial Identification and Evaluation Planning meeting to determine whether an evaluation for eligibility for special education and related services for Z.P. was warranted.

85. District personnel performed a "structured observation" during which time Z.P. interacted one-to-one with the CST members.

86. There were no other children present.

87. As noted by his teacher at Bright Horizons, Z.P. has "most success with individual activities and loves having one on one time with a teacher." Children with ASD often have difficulty with social reciprocity, particularly with peers.

88.     The District's speech-language therapist, JoAnne Hyman, used the PLS-5 screening tool, not the full assessment, to analyze Z.P.'s language, articulation and social/interpersonal skills.

89.     The PLS-5 score sheet Ms. Hyman completed, in evidence as J-7, mirrored results from the more extensive evaluation completed at CHOP only six weeks earlier.  Z.P.'s strength was naming objects in photographs, but he struggled with using word combinations and articulation.

90.     According to the District's report, Z.P. scored the minimum number of points needed to pass the PLS-5 screener.

91.     The District also used the PLS-5 screener to determine Z.P.'s social-interpersonal needs even though the behaviors in a checklist in the screener such as, "has frequent tantrums that disrupt family life" and "does not calm down when caregivers try to comfort him" would likely not be observed during this type of meeting.

92.     Despite the extensive amount of information provided by the Parent prior to and during the identification meeting concerning Z.P.'s tantrums, sensory needs, and self-directed behavior, Ms. Hyman inexplicably circled on the checklist "none of these behaviors are noted" and marked Z.P. as having passed the social-interpersonal portion of the screener.

93.     Without conducting any formal evaluations or observing Z.P. interact with peers, District personnel determined Z.P. was not eligible for special education and related services as a preschool child with a disability.

94.     The District's documentation of the meeting, entered into evidence as J-6, showed the structured observation in a non-academic setting without peers present was the only "procedure(s), test(s) record(s) or reports(s)" the District used in its determination that Z.P. was

not "suspected of having a disability which adversely affected his educational performance" and that an evaluation was not warranted.

95.     The District did not consider the CHOP assessments or other information the Parent had provided prior to the meeting and there were "no other options considered" at that time according to the District's forms.

96.     The District did not provide the Parent with the required written notice pursuant to N.J.A.C. 6A:14-2.3(f)-(g) as to why the District declined to evaluate Z.P., nor with copies of the special education regulations and due process hearing rules as required under N.J.A.C. 6A:14-2.3(i).

**The District Agrees To Evaluate Z.P. To Avoid Mediation**

97.     As Z.P. was about to age out of eligibility for EI services, a Certified Test Administrator on EI's Targeted Evaluation Team, assessed him using the Battelle Developmental Inventory-2nd Edition ("BDI-2")

98.     Z.P.'s total communication score on the BDI-2 assessment was at the 5th percentile rank based on an expressive communication score at the 9th percentile rank and a receptive score at the 1st percentile rank.

99.     On February 11, 2019, the Parent provided the District a copy of the BDI-2 results attached to an email to Z.P.'s case manager in which the Parent again expressed concern about Z.P.'s speech-language abilities.  The BDI-2 report is in the record as J-11.

100.    Three days later, the case manager responded to the email stating they would have a conference call "to discuss next steps" but gave no indication District would conduct an evaluation of Z.P.

101.    In further email communication, dated February 18, 2019, the Parent requested written notice be provided to her as to why the district refused to evaluate Z.P.

102.    In response to A.C.'s request, on February 19, 2019, the case manager wrote "we did explain our rationale and show you the data we had to determine that evaluations were not warranted," but she did not provide the required written notice.

103.    The Parent responded that same day.  In her email, she outlined specific concerns to be addressed when the parties met and made a written request that the District evaluate Z.P. in the areas of pragmatic language, adaptive behavior, and sensory integration.

104.    The case manager did not respond to the Parent's email but forwarded it on to her supervisor, Samantha Tognela, for her review.  The string of email correspondence between the Parent and the case manager is in the record as J-12.

105.    On February 21, 2019, the Parent filed a mediation-only request with the New Jersey Department of Education's Office of Special Education Policy and Dispute Resolution ("SPDR"), seeking to have the district reconsider Z.P.'s eligibility for special education and related services.  She withdrew that request after the district agreed to evaluate Z.P.

106.    The Parent provided the BDI-2 report to Z.P.'s team at CHOP by uploading it to the hospital's patient portal, MyCHOP.

107.    Reviewing the BDI-2 results, Dr. Bennett was concerned enough about Z.P.'s denial to the preschool program, that, without being asked, she proactively wrote a "To Whom It May Concern" letter reiterating her recommendations for Z.P. including being placed in a full-time integrated autism preschool program.

108.    The Parent provided the letter, dated February 27, 2019, to the District and it is entered in the record as J-13.

109.    The parties met on March 11, 2019 for an Evaluation Planning Meeting that was audio-recorded.

110.    The Parent had retained the services of an educational advocate who accompanied her to the March 11, 2019 meeting.

111.    Upon arriving at the meeting, the Parent learned the District personnel had planned to conduct the evaluation of Z.P. that day.

The District had not informed the Parent which assessments the District had determined it would conduct that day, requested her consent for the evaluation, or warned her to come to the meeting prepared to be there long enough for an evaluation to be completed.

112.    The advocate was particularly concerned that the District planned to evaluate Z.P. less than two weeks prior to his turning three years old because the scales used in many assessments change and have higher expectations when a child turns three.  After his third birthday, Z.P.'s performance would be compared with standardized norms for three-year olds.

113.    At the March 11, 2019 meeting, the District proposed only speech-language and psychosocial assessments, clearly indicating a pre-determined evaluation plan that ignored input from the Parent who had requested Z.P.'s pragmatic language, which involves social use of language, adaptive behavior, and sensory integration skills be evaluated.

114.    A sensory integration assessment would typically done by an occupational therapist, but the District did not have an occupational therapist attend the Evaluation Planning Meeting.

115.    When Z.P. began to display maladaptive behaviors, hitting the general education teacher with a toy hammer, the case manager sought to turn off the recording and wrap-up the meeting.

116.    Wanting to have her child evaluated, the Parent provided written consent for the District to conduct speech-language, occupational therapy, and psychosocial evaluations.

117.    On March 22, 20219, Z.P. aged out of EI; thus, the services he had been receiving in speech-language, occupational therapy and developmental intervention ended.

118.    As a result, the Parent was required to continue speech-language services privately at CHOP and to incur the cost of preschool services at Bright Horizons beginning March 23, 2019.

**District Does Not Evaluate Z.P. In All Areas Of His Disability**

119.    Although the classroom observation was scheduled for after Z.P.'s third birthday, he remained in the two-year-olds' room at Bright Horizons until after the observation. The two-year-olds' room had only eight children of which Z.P. was the oldest. His like-aged peers, many of whom he had been in class with for a year, had all transitioned to the three-year olds' room which contained as many as 20 children.

120.    The case manager had requested Z.P. remain in the two-year-olds' room because "she wanted to observe him with a familiar teacher."

121.    Z.P.'s case manager, Dr, Nash, and Diane Heiser, a District school social worker, observed Z.P. on March 27, 2019.

122.    At the district's request, Z.P.'s teacher, Ingrid Sparv Oehlke, in whose class he had now been for ten months, completed a Developmental Profile-3rd Edition ("DP-3") interview scale to assess Z.P.'s social-emotional functioning.

123.    The scale showed that Z.P.'s social-emotional skills, at only the 12th percentile rank, were below average for his age. The DP-3 is entered in the record as J-14.

124.    The DP-3 is a screening tool capable of assessing a child in all five of the developmental domains required to be evaluated for preschool students under N.J.A.C. 6A:14-

3.5(c)(10): (1) Physical, including gross motor, fine motor, and sensory (vision and hearing); (2) Intellectual; (3) Communication; (4) Social and emotional; and (5) Adaptive.

125.    By providing the teacher the DP-3, but only having her report on one domain, the District purposefully did not obtain teacher input concerning Z.P.'s physical, communication and adaptive skills, other domains in which Z.P. had delays of which the District was well aware.

126.    The case manager testified that although Z.P.'s performance was in the below average range; it was not so significant that the team had a concern at the moment.

127.    However, since the DP-3 is a screening tool, Z.P.'s below average scores indicated the need for a more comprehensive evaluation of his social-emotional skills to develop an appropriate educational program that would meet these needs.

128.    On April 5, 2019, Elizabeth Kidney, a District occupational therapist, conducted an occupational therapy evaluation of Z.P.

129.    Ms. Kidney had not been at the evaluation planning meeting. Nevertheless, her report noted "parental concerns about sensory processing", but wrote the CST had requested the evaluation only to "determine any difficulties (Z.P.) may have in the areas of fine-motor and visual motor skills." The OT report is in the record as J-21, but the District did not have Ms. Kidney or any occupational therapist testify.

130.    Ms. Kidney administered only one assessment, the Peabody Developmental Motor Scales (PDMS-2).

131.    Z.P. scored in the 16th percentile, "below average" in the grasping subtest.

132.    The Parent waited outside the room where the OT evaluation was being done, and she observed Z.P. get up and run away nine times during the thirty-minute evaluation.

133. On April 3, 2019, JoAnne Hyman, a District speech-language therapist, administered: the Goldman-Fristoe Test of Articulation-Third Edition, ("GFTA-3") to assess Z.P.'s intelligibility; the Descriptive Pragmatics Profile of the Clinical Evaluation of Language Fundamentals ("CELF Preschool-2"); and the Test of Early Language Development-4, ("TELD-4").

134. Z.P. obtained average scores on the TELD-4 which were based solely on interactions with Ms. Hyman.

135. For unknown reasons, however, she neglected to analyze and score the raw data she collected while administering the GFTA-3, an assessment that the CHOP speech-language therapist who treated Z.P. was able to score using Ms. Hyman's notations. The CHOP speech-language therapist later testified that those scores placed Z.P.'s articulation at the tenth (10th) percentile rank.

136. Without doing the necessary analysis of the data, and presenting no objective scores to support the conclusion, Ms. Hyman concluded that Z.P. was able to produce all of the sounds that ninety percent (90%) of three-year-olds are able to do.

137. On the CELF Preschool-2 Descriptive Pragmatics Profile, Z.P. failed to meet the criterion score for his age. Again, Ms. Hyman only reported the score Z.P. obtained and the criterion score with no analysis, percentile rank, or comment on the educational implication of the score.

138. Ms. Hyman did not appear as a witness for the District to explain the results of the District's speech-language assessments. The ALJ permitted hearsay testimony from the case manager that Z.P. did not meet the criteria necessary to receive speech-language services in school, but the case manager was not able to identify what those criteria were, and the District did not

produce a witness competent to testify as to the criteria speech-language criteria and why Z.P. was not eligible to receive services.

139.    The District also did not provide a foundation or submit any evidence for its claim, which the ALJ accepted, that there is a difference in assessing a child's need for speech-language therapy in school and in other settings.

**The District Again Finds Z.P Ineligible For Special Education**

140.    On May 24, 2019, the District held an Eligibility Determination meeting.  The District never offered an explanation of why it took two and a half months after the evaluations to hold the eligibility meeting.

141.    At the meeting, the Parent described changes in Z.P.'s behavior since beginning in the three-year-olds' preschool class at Bright Horizons.  Z.P. was then two months older than the age at which his peers had transitioned into the class, and he knew many of his classmates from having been in the two-year-olds' class with them for the better part of a year.

142.    Z.P., who had previously been very eager to go to Bright Horizons, now refused to get out of the car, and when he did enter the building, would put his hands over his ears and repeatedly say, "too loud."

143.    The Parent described many instances of Z.P. screaming, crying, and attempting to elope from the building.

144.    Z.P. also began biting and trying to hit adults and peers, things he had not done in the two-year-olds' room.

145.    As a result, Bright Horizons had to assign another adult as a one-to-one monitor of Z.P.'s behavior for his safety and that of the other students and teachers.

146.    The District insisted that, based upon the information it had at the time, specifically its own assessments, including its observation on March 27th of three-year-old Z.P. in a two-year-olds' classroom , Z.P. was not eligible for special education related services.

147.    Dr, Nash testified that Z.P, did not exhibit the requisite criteria to be found eligible for special education, insisting the criteria was limited to children with a 25% delay in two or more areas or a 33% delay in one area, and ignoring the alternative criteria in that section of the N.J. Administrative Code that a child with, "an identified disabling condition…that adversely affects learning or development and who requires special education and related services" is also eligible.

148.    The District failed to make a procedurally valid determination that Z.P. was not eligible for special education because it failed to assess Z.P. in all areas of suspected in violation of the IDEA.

149.    Contrary to Dr. Nash's testimony, a special education eligibility determination requires a School District first to evaluate a child in all areas suspected disability, which did not occur in this case in violation of 20 U.S.C. § 1414(b)(3)(B), 34 C.F.R. § 300.304(c)(4), N.J.A.C. 6a:14-2.5(b)(3).  Without such an evaluation, a school district cannot properly determine if a child has a qualifying disability, whether that disability adversely affects the child's educational performance, and whether the child is in need of special education and related services.

150.    Among other things, the District failed to score the GFTA-3 speech-language assessment and report Z.P.'s performance compared to norm-based standard scores or percentiles, which prevented any analysis of the amount of delay Z.P. exhibited in speech, specifically in articulation.

151.    The District also ignored Z.P.'s low pragmatic language scores in determining if Z.P. had a significant delay in the areas of communication or social emotional functioning.

152.   As of the May 24, 2019 meeting, the District had a report and letter from Dr, Bennett at CHOP, the private speech-language evaluation conducted at CHOP, the BD-2, as well as Z.P.'s teacher's input from December 2018 and April 2019, all of which documented and quantified Z.P.'s developmental delays in in three of five areas listed in the pertinent code section: communication, social-emotional, and adaptive domains.

**Parent Files For Mediation A Second Time**

153.   On May 29, 2019, A.C, *pro se,* filed another Request for Mediation with SPDR stating that there was an overwhelming amount of clinical evidence supporting Z.P.'s eligibility for special education services as a preschool child with a disability and requesting that the District reconvene a meeting the following week to develop an IEP for Z.P.

154.   A.C. testified at the hearing that she had read in the New Jersey Department of Education's publication, *Parental Rights in Special Education*, that a due process hearing must be completed, and a copy of the decision must be mailed to the parent within 45 days of the case being transmitted to the OAL.  She further testified that as a result, she believed her case would be resolved in time for Z.P. to be able to start in the District's preschool Extended School Year program in early July 2019.

155.   On or about June 10. 2019, the Parent retained counsel who, after obtaining the consent of the District's counsel, requested SPDR convert the mediation-only petition to a petition for due process.

156.   The Parent's counsel also notified SPDR that both parties agreed to waive mediation and a resolution session, and they jointly requested that the matter be transmitted immediately to the OAL for a settlement conference be held on June 20, 2019.

**Z.P. Continues To Be Followed At CHOP**

157.    In early June 2019. Z.P. returned to CHOP for a regular six-month follow-up visit. After that visit, Dr. Bennett wrote another "To Whom It May Concern" letter beginning by stating that her recommendations were "to allow [Z.P.] an opportunity for an equitable education" and that Z.P. needed interventions using methods of applied behavior analysis ("ABA") to address social communication and developmental deficits as well as repetitive, rigid, and sensory-based behaviors.  Those recommendations were:

a) Twice weekly speech language therapy to advance functional verbal and nonverbal communication, receptive language skills (following directions), and pragmatic language to address atypical language profile;

b) Occupational therapy at least once weekly to advance fine motor, visual motor, self help, play, and sensory processing skills;

c) A board certified behavior analyst (BCBA) or behavior specialist with an ABA background to monitor progress with current goals and develop intervention plans for new goals that should include attention to adult-directed activities, aggression, social skills, safety awareness, and functional communication; and

d) Classroom placement in a full time inclusion class that includes both typically developing students and students with special education needs to help provide social role models while giving needed support.

158.    The Parent sent that letter to the District and it was in evidence as J-24.

159.    On June 5 and 12, 2019, Debra Levin, Z.P.'s speech-language therapist at CHOP, conducted a speech-language assessment.

160.    Using the same evaluation instrument as one the District had used only two months earlier, the GFTA-3, Ms. Levin found that Z.P.'s articulation skills were now at the fifth (5th) percentile rank.

161.    Ms. Levin also administered the pragmatic language subtest of the Comprehensive Assessment of Spoken Language-2nd Edition ("CASL-2") and found Z.P.'s pragmatic language skills to be at the third (3rd) percentile rank.

162.    Ms. Hyman had also administered a pragmatic language assessment to Z.P. in April, the CELF Preschool-2 Descriptive Pragmatics Profile.  As with the GFTA-3, she used in her evaluation, she did not report either the standard scores or percentile ranks that Z.P. attained in this assessment.

163.    Ms. Levin's June 12, 2019 speech-language evaluation report, which was provided to the District, by and through counsel, on June 13, 2019, was entered into the record as J-25.

164.    Ms. Levin testified at the hearing.  She has been a licensed speech-language pathologist since 1997 and has worked at CHOP for more than 20 years.  In addition to providing direct therapy, as part of her work as a senior speech-language pathologist at CHOP, she supervises graduate students and clinical fellows preparing to become speech-language pathologists.

165.    In her testimony, Ms. Levin stated that the GFTA-3 data Ms. Hyman collected on April 4, 2019 could have been scored, and that using Ms. Hyman's notations, she was able to score the assessment.

166.    From the responses Z.P. provided on the GFTA-3 in April, Ms. Levin determined Z.P.'s articulation scores placed him at the 10th percentile and his language abilities at the 5th percentile, both having an age equivalency of less than two years of age.

167.    Ms. Levin's testing of Z.P. in June 2019 showed Z.P.'s speech and language skills were significantly impaired, and as a child with an Autism Spectrum Disorder, Z.P. should be found eligible for speech language therapy in a preschool setting.

168.    In addition, Z.P.'s speech intelligibility was rated as 5 (speech is difficult to understand with many words unintelligible) and noted that a three-year-old is expected to be understood about 75% of the time whereas Z.P.'s intelligibility was much less than 75%.

169.    Based on her evaluation, Ms. Levin included several recommendations for interventions and listed goals for continuing speech-language therapy in her report.

**The District Agrees To Observe Z.P In the Three-Year Olds' Class At Bright Horizons**

170.    Prior to the June 20, 2019 settlement conference, the District's counsel notified Parent's counsel that the District would agree to conduct another observation of Z.P., this time in his three-year-olds' preschool class at Bright Horizons.

171.    Counsel for the parties did not discuss or agree on a specific date for the observation, nor did anyone from the District contact the Parent or Bright Horizons to schedule a date for the observation.

172.    On June 14th, the Parent was surprised to find district personnel waiting at Bright Horizons when she arrived to drop off Z.P.

173.    The Parent on-the-spot gave her consent for the observation to be conducted that day, however, upon learning Z.P.'s regular teacher was not going to be in that day, District personnel chose not to conduct the observation then.

174.    The observation took place on July 11, 2019.

175.    The case manager's report of the observation, entitled "Preschool Social-Emotional & Functional Assessment" clearly documented the issues the Parent and Z.P.'s providers had been conveying to her since October 2018.

176.    The report, entered into the record as J-26, documented the case manager's own observations of Z.P.'s maladaptive behaviors which included: screaming and crying as his mother

left him; taking off his shoe; eloping from the classroom and out the door; crying when he did not get his way; attempting to kick or trip another child and later pushing that same child; the same type of maladaptive behaviors the Parent and Z.P.'s providers had been reporting to the District since the EI Transition Planning Meeting in October 2018.

177.    Z.P.'s teacher completed the Developmental Indicators for the Assessment of Learning-4th Edition (DIAL-4).  Z.P. scored in the first percentile in the domains of self-help and social-emotional skills.  Like the DP-3, the DIAL-4 is designed to assess a child in other developmental areas including language and motor skills, but again, the District limited the teacher's input to social-emotional and adaptive skills.

**The August 2019 IEP Predetermined A Program That Did Not Did Not Provide Z.P. A FAPE**

178.    On August 8, 2019, the parties met for the third time to determine Z.P.'s eligibility for special education programming and services.

179.    At this meeting, the CST arrived already having pre-determined Z.P. was eligible for special education based solely the results of the July 11th observation which had focused only on Z.P.'s self-help and social-behavioral needs.

180.    The district found Z.P. eligible for special education as a preschool child with a disability and proposed an IEP that would place Z.P. for the 2020-2021 school year in the District's half-day, integrated preschool class, in which students with disabilities are educated with non-disabled peers.

181.    The case manager testified that the program was selected for Z.P. "because he exhibited strong cognitive development and the team felt that he was appropriate to continue to participate in the general education preschool but with the support of the special education teacher and appropriate accommodations and modifications."

182.   The IEP provided only generic modifications used for the whole class with no explanation of how these the modifications would address Z.P.'s specific needs.

183.   The District only has free preschool classes for students with disabilities.  The general education peers in the half-day integrated preschool class preschool, who must reside in the District, pay tuition.  The District also has self-contained preschool classes for students with disabilities.

184.   The District's integrated preschool class did not have the support of a BCBA as recommended by Dr. Bennett and the CHOP team for Z.P. as a preschooler with an Autism Spectrum Disorder.

185.   The proposed IEP also did not provide for the school-based related services of speech-language or occupational therapy that Dr. Bennett and the CHOP Team had recommended.

186.   Transportation with an aide on the bus was the only related service listed in Z.P.'s IEP.

187.   At the IEP meeting, the Parent again described how Z.P. would become frustrated and have behavioral outbursts when he was not understood, and she requested that Z.P. receive a weekly session of speech and language therapy to address his pragmatic use of language and intelligibility.

188.   The case manager, who is a school psychologist not a speech-language therapist, testified that at the time, Z.P. did "not meet eligibility for services from the speech and language department," but never defined the eligibility criteria for those services.

189.   At most, she testified that Ms. Hyman told her Z.P. did not need speech-language therapy, and Ms. Hyman did not testify.

190.   The case manager's testimony was clearly refuted by Ms. Levin's testing which showed Z.P.'s articulation score to be at the 5th percentile (< 2 years) and his pragmatic language score to be at the 3rd percentile (<3 years old), as well as by Ms. Levin's testimony.

191.   Although the District had a copy of Ms. Levin's reevaluation report well in advance of the August 8, 2019 eligibility determination meeting, the report was not listed under the most recent evaluations or reports considered or referenced anywhere in the IEP.

192.   The District's consistent failure to consider information from private evaluations procured by the Parent violated the Parent's right to meaningfully participate in the provision of a FAPE for Z.P.  The case manager testified at the hearing that a screening of articulation needs could be conducted within four weeks of school opening to determine possible impact on Z.P.'s ability to be understood by adults and peers, but longstanding precedential case law requires IEPs to be reviewed on what is in them, not what could be.  *Lascari v. Board of Education of Ramapo Indian Hills Regional High School District*, 116 N.J. 30 560 A.2d 1180 (1989); N.J.S.A. 18A:46-1.1.

193.   On August 14, 2019, wanting her son to be able to start preschool in September, the Parent provided written consent to implement the IEP, but noted on the consent form that she "(did) not agree to the denial of speech services."

194.   The Parent raised other concerns at the August 8, 2019 eligibility meeting that were documented in the IEP including that Z.P. elopes from situations he finds overwhelming and engages in sensory-seeking actions, such as putting objects in his mouth when he is feeling anxious or overstimulated.

195.   The District's preschool special education teacher, Ms. Weston, telephoned in to the August 8th meeting to introduce herself to the Parent.

196. Ms. Weston testified that when she called in, there were no specific concerns presented to her about Z.P.'s functioning. She was told by the case manager that Z.P. was a nice boy who liked to read books, and she was made aware that Z.P. had allergies.

**Z.P.'S Life Threatening Allergies**

197. On July 24, 2019, counsel for the Parent had sent counsel for the District a copy of the allergy action plan developed for Z.P. by Rahul Datta, M.D., Ph.D. of CHOP's Division of Allergy and Immunology.

198. At the August 8th meeting, the case manager assured the Parent that she would ensure both the school nurse and the transportation department were notified of the allergy action plan because Z.P. would be taking a school bus daily.

199. The Parent followed up with the school nurse to confirm Z.P.'s bus driver be notified of his life-threatening allergies, and the nurse replied by email on August 26, 2019 that she would do so.

200. On August 14, 2019, Parent provided additional information about Z.P.'s allergies and asked the case manager if there would always be an aide on the bus. The case manager responded that she was copying the email to the transportation department and that the transportation coordinator was aware of Z.P.'s needs.

201. On August 30, 2019, the Parent emailed the case manager, copying the school nurse and the district's supervisor of special services, that she would provide the nurse with two epinephrine auto-injector devices, known as epi-pens, to have available for Z.P., and that she would put a clearly marked medical emergency bag in Z.P.'s backpack that should only be removed from the backpack in a medical emergency.

202.    On September 5, 2019, Parent attended a preschool orientation where she was able to meet and speak with the school nurse who informed the Parent that it was, "against district policy," for Z.P. to have his epi-pen on the bus because he was too young to self-administer the medication.

203.    The nurse did not offer any alternatives as to how the District would implement the requirements in Z.P.'s Allergy Action Plan which made clear that Z.P. is at, "**High Risk for Severe reaction**" and that, "**Epinephrine auto-injector must be available at all times.**" (Emphasis in original.)  The Allergy Action plan was in evidence at the hearing as J-62.

204.    New Jersey statutes and administrative code require a nurse or another appropriately trained designee to be on the bus to administer the epinephrine.  N.J.S.A. 18A:40-12.5, 18A:40-12.6, N.J.A.C:16- 2.1(a)(4)(i),

205.    The District's own Policies and Regulations (5330 and 5331) require the same. Those policies and regulations were in evidence at the hearing as J-70, J-71, J-72, and J-73.

206.    On the day of the orientation, Z.P. was hospitalized as a result of a severe asthma attack.  He was unable to attend the orientation and he missed the first few days of school in 2019.

207.    When the bus arrived to pick up Z.P. on September 11, 2019, his first day of preschool, the Parent spoke to the driver who informed her that she (the bus driver) had not been told that Z.P. had allergies.

208.    The Parent immediately notified multiple district personnel including Z.P.'s case manager, the district's transportation coordinator, the supervisor of special services, and the school nurse, of the situation.

209.    The transportation coordinator spoke to the Parent and then followed up by email advising her that the coordinator had spoken to the bus company which, "has informed both the

am and the pm driver and aide, of your child's allergies.  We also went over what to do in case of an emergency, the drivers know to pull over and call their supervisor immediately, and 911 will be called immediately", putting the need to call the office *before* calling 911.

210.    Given the severity of Z.P.'s allergies, his allergy action plan directs that the epi-pen, which the district refused to allow to be carried on the bus, be administered even before calling 911 for transport to the nearest emergency room.

211.    On January 29, 2020, when the Parent asked the school nurse for a copy of Z.P.'s Individual Healthcare Plan, (IHP), she learned that the District had never created an IHP or an Individual Healthcare Emergency Plan ("IHEP") for Z.P.

212.    Not realizing that the issue had not been resolved at the beginning of the school year, Parent's counsel did not follow up further until the Parent advised that no IHP or IHEP had been created.

213.    On January 30, 2020, Parent's counsel sent a letter via email to the District's counsel attaching another copy of the Allergy Action Plan and asking that the District immediately comply with the plan as well as developing an IHP and IHEP.  That letter and attachment is in evidence as J-64.

214.    Dr. Datta issued a "To Whom It May Concern" letter on January 30, 2020 reiterating that because Z.P. has had severe allergic reactions in the past, he needed to have both his epi-pen and the albuterol inhaler he uses to control his asthma with him at all times including on the school bus.  The parent gave a copy of this letter to the District and it is in evidence as J-65.

215.    Some time between January 30th and February 5, 2020, the District created an IHP and an IHEP, both of which were inadequate because they still did not allow an epi-pen or an

inhaler on the school bus.  By letter emailed and dated February 5, 2020, Parent's counsel again asked the District's counsel to direct the District to revise the plans to comply with Z.P.'s physician's orders.  That letter is in evidence as J-66.

216.    The District's counsel responded on February 7, 2020 by letter, which is in evidence as J-88, stating that the school nurse, "asked for more specific doctor's orders regarding Z.P.'s need for an epi-pen … on the bus."

217.    Although there was nothing unclear about his previous orders, on February 12, 2020, Dr. Datta wrote another order that is in evidence as J-67, stating that Z.P. needed the epi-pen and albuterol available at all times to treat a potential anaphylactic reaction due to his severe allergies.

218.    The District continued to refuse to allow Z.P. to have his rescue medications on the bus.  He did not have an anaphylactic reaction on the bus, but he did have one at school on February 27, 2020.

219.    The school nurse called the Parent when Z.P. developed a rash after physical education class and asked A.C. to pick up Z.P. from school.  In response to A.C.'s question, the nurse said she had not administered his epi-pen.  When A.C. arrived at the school, the nurse said that the reason she didn't administer the epi-pen was that the one she had in the health office had expired – something she hadn't notified A.C. about.

220.    Z.P. was hospitalized for approximately eight hours to treat the anaphylaxis.

221.    The District did not call any witnesses or offer any competent evidence at the hearing to support their refusal to allow Z.P. to have his rescue medications on the bus even though the ALJ gave the District permission to address the issue on rebuttal.

222.    The Parent's testimony and the documentary evidence were uncontroverted, but the ALJ still did not make a clear ruling on whether the District failed to provide Z.P. the related service of transportation in his IEP in a safe manner.

**Z.P. Is Diagnosed As High Risk For Elopement**

223.    On August 9, 2019, the day after the IEP meeting was held, Z.P. eloped from the daycare center.  He ran out of class, to the outer door, and having watched his teacher enter her passcode and memorized it, Z.P. entered the code and opened the door.  He made it out into the parking lot and was running toward Route 1 before adults were able to catch up with him.

224.    After the incident, the Parent contacted Dr. Bennett who requested she bring Z.P. in for an unscheduled visit.

225.    Dr. Bennett was so concerned about Z.P.'s elopement that she issued the Parent a handicap placard so she would be able to park close to building entrances, since going in and out of busy places can be an overwhelming sensory stimulation for Z.P. that triggers him to elope creating a danger to him and others, in a parking lot.

226.    Shortly thereafter, the family began the process of qualifying Z.P. to be matched with an autism service dog, a process that can and did take up to two years.  Z.P. was matched with a dog in May 2021.  The dog helps anchor Z.P. in public spaces to prevent him from eloping.

227.    Dr. Bennett had also reviewed documentation from Z.P.'s speech and occupational therapy visits at CHOP and concluded that he was "making continued gains in therapies but also continues to demonstrate deficits, particularly in areas of expressive communication concepts (plurals and pronouns) and in areas of self-regulation, motor planning, and safety awareness."

228.    Dr. Bennett also described Z.P.'s sensory seeking behavior of jumping and climbing and that he is bothered if touched by others, which can be problematic.

229.    A.C. testified at the hearing that Z.P. often tries to jump down steep sets of stairs and climbs into precarious places.

230.    None of Z.P.'s physical or adaptive deficits were addressed in his IEP.

231.    Dr. Bennett's letter, which was in evidence as J-31, included Recommendation/Plan for education and behavioral services whereby she stated:

a)  Recommend close monitoring of speech and language-based skills in preschool programming with reevaluation if Z.P. shows increasing deficits.

b)  Recommend monitoring of fine motor skills and consider reevaluation by occupational therapist.

c)  Agree with monitoring cognitive skills as Zachary gets older and re-evaluation for possible gifted programming closer to school-age.

d)  Strongly recommend dedicate one-on-one support in the typical daycare setting for both safety awareness and peer socialization.

**Due Process Litigation Moves Forward**

232.    On October 1, 2019, the parties met for an initial status conference with ALJ Buck. The District claimed that the due process petition should be dismissed as moot, and the Parent argued that the failure to provide speech-language services denied Z.P. a FAPE, so a controversy remained.

233.    At the conference, the District produced a document, dated that same day entitled, Speech/Language Update, written by Ms. Weston, the special education teacher who co-taught Z.P.'s integrated preschool class.  This document was entered into evidence as J-35.

234.    The document, proffered to support the District's continued refusal to provide Z.P. speech-language services, listed several statements in quotation marks that Z.P. allegedly made that were more grammatically advanced than the Parent had ever heard him make.

235.    Ms. Weston, who has no expertise or experience in speech-language, was not qualified to provide a speech/language update.

236.    Ms. Levin, the CHOP speech-language therapist testified later at the hearing that as of October 1, 2019, Z.P. was unable to have made the statements attributed to him.

237.    After the Parent questioned the validity and reliability of this document, the District offered to conduct yet another speech-language "screening" of Z.P., but only in the areas of speech articulation and language development, not pragmatic language even though Ms. Weston had written that "[Z.P.] continues to work on learning to communicate his thoughts and feelings when he is angry/upset rather than engage in physical behaviors."

**Z.P.'s Difficulties at Preschool**

238.    The speech-language screening was conducted by Amanda Gagnon, a speech-language therapist for the District.  As part of the screening, she asked Ms. Weston to complete a form entitled, "Teacher Observation of Student behavior in the Classroom."   The form, which was dated October 14, 2019, and was in evidence as J-36, shows that Z.P. was exhibiting atypical behavior for 8 of 12 measures.

239.    The only standardized measure used as part of the screening was the Fluharty Preschool Speech and Language Screening Test, Second Edition ("Fluharty-2").   Z.P.'s articulation score on that was even lower than he had scored previously and below the first percentile rank.  His expressive language score was at the fifth percentile rank, and his general language score was at the twelfth percentile rank.  In addition, it is supposed to take only ten minutes to administer the Fluharty-2, but it took 45 minutes to assess Z.P. with it.

240.    The results of the Fluharty-2 also aligned with the results of the comprehensive evaluation Ms. Levin had conducted at CHOP four months previously.

241.    During this period, Z.P.'s sensory issues, specifically his adverse reactions to stimuli, resulted in behavioral issues that caused him to miss instruction time on a nearly daily basis.

242.    Ms. Gagnon also observed Z.P. in school three times as part of the speech-language screening.  During one of those observations, on October 16, 2019, Ms. Gagnon first saw Z.P. in the hallway where Ms. Weston was trying to prevent him from running away.  He was banging on the classroom door with his fist and shouting, "Le (let) me go, le (let) me go, le (let) me go, go, go!"

243.    He then began to kick the door with both feet.  The school nurse was summoned to examine Z.P. for possible injuries.

244.    Ms. Gagnon described the incident in the first version of her report of the speech-language screening, which she sent to her supervisor via email on October 25, 2019, the day after Z.P. had been physically restrained at school.

245.    The email asked the supervisor to let Ms. Gagnon know if anything needed to be changed.  The version of the report that was later sent to the Parent omitted everything about the events in the hallway including the nurse being called.

246.    Ms. Gagnon, who does not have tenure, could "not recall" if her supervisor requested that she remove anything from her report.  That supervisor did not testify at the hearing, but was present via Zoom during all sessions and observed all testimony

247.    Z.P.'s teachers had told the Parent that he had been removed from class on October 16, 2019, however, the Parent did not learn the extent of Z.P.'s behavior, including that he was examined by the school nurse, until she received the exhibits prepared for the due process hearing.

248.    October 16, 2019 was not the first time Z.P. had to be removed from class for behavior problems.  The Parent emailed the case manager that day requesting Z.P.'s IEP be amended to include a behavior intervention plan, ("BIP") citing to verbal reports from his teachers that this was the third day in less than a week that he had been non-compliant for 20 minutes.  That email is in evidence as J-39.

249.    As a result of his behavior that District staff was unable to manage, Z.P. was missing instruction for significant portions of the 150-minute school day.

250.    After learning from Z.P.'s teachers only that he had been removed from class again, on October 16, 2019, the Parent emailed the case manager requesting that his IEP be amended to include a behavior intervention plan, ("BIP") citing to verbal reports from Z.P.'s teachers that this was the third day in less than a week that he had been non-compliant for 20 minutes.

251.    The Parent reiterated her concern that because Z.P. was unable to articulate his feelings when he became frustrated, he "will resort to destructive/undesired behaviors" and that she believed that school-based speech-language therapy would help lessen Z.P.'s frustration level leading to improved behavior.

252.    The District refused revise Z.P.'s IEP to include a BIP, but Z.P.'s teachers began keeping a log of Z.P.'s behaviors that was later shared with the Parent.

253.    The weekly behavior logs, in the record as J-76, recorded some but not all of Z.P.'s incidents of non-compliant behavior.  These incidents sometimes lasted more than ten minutes and occurred several days each week.

254.    The Parent witnessed several incidents of non-compliance during dismissal/pick-up time, and she requested verbally, and by email, to have them recorded in Z.P.'s log.

255. The District refused to make a record of these incidents, insisting that dismissal time was not part of instructional time.

256. On October 24, 2019, due to an "unknown" trigger, Z.P. tried to elope. His behavior escalated to the point where he was physically restrained for ten (10) minutes.

257. According to the district's report of the restraint, the incident took a total of 40 minutes or more than 25% of instructional time that day.

258. The District's required form documenting the use of restraint is in evidence as J-40.

259. The next day, October 25, 2019, the Parent again wrote to the case manager renewing her request to have a BCBA observe Z.P. in the classroom. Such an observation, known as a functional behavior assessment ("FBA") would provide necessary information about the triggers of Z.P.'s behaviors, their frequency, and his response to the modifications and accommodations in his IEP that were supposed to address his behavior.

260. The case manager never responded to these requests.

261. As described above, on November 11, 2019, the Parent filed a motion for emergent relief to obtain speech-language services and a BIP for Z.P. The District filed a cross-motion to compel consent for a speech-language evaluation.

262. Ultimately, the Parent consented to the speech-language evaluation and an IEP meeting was held on December 16, 2019. At the meeting, the District agreed to begin providing Z.P. speech services after the winter break and only for articulation.

**The December 16, 2019 IEP Still Did Not Provide Z.P. A FAPE**

263. The Parent was accompanied at the December 16, 2019 IEP meeting by Dr. Lindsay Hilsen, a board-certified behavior analyst-doctoral, ("BCBA-D") to discuss Z.P.'s unique needs

and make arrangements to conduct a FBA of Z.P. within the agreed to 30-day postponement of the emergent relief decision.

264. District insisted that a BIP was not needed because according to the case manager, they had "anecdotal data to determine that Z.P. was making meaningful educational progress on his goals with the modifications and accommodations implemented." The District did not present any data at the meeting, and made only non-specific comments about Z.P.'s progress.

265. At the hearing, the District produced progress reports purportedly documenting Z.P.'s progress on his IEP goals and objectives. The reports, in evidence as J-91 and J-92, were both dated May 14, 2020. The District claimed they were timely posted on its online portal.

266. The Parent testified she had not seen these reports prior to receiving the exhibit binder even though she regularly checked the District's online portal. She also testified that once she became aware of them, she actively searched for them in the portal but was unable to find them until sometime in June 2020.

267. The progress reports supposedly show Z.P. was "progressing satisfactorily" on his social emotional goals which were being measured by "structured observations of the targeted behavior."

268. The District has never presented any data to support the "progressing satisfactorily" score and the report did not contain teacher comments or an explanation describing Z.P.'s progress towards in these goals.

269. An agreed-upon additional thirty-day extension for the ALJ to consider the emergent relief motion expired on January 27, 2020, however, instead of issuing a decision, the ALJ held a telephone conference that day.

270.    Although Dr. Hilsen had only been permitted to observe Z.P. for a short time on January 13, 2020, she issued an initial report shortly afterward.  This report, which stated that a formal behavior plan was warranted, was provided to the District and to the ALJ on January 22, 2020, and is in the record as J-60.

271.    During the January 27th teleconference, the District's counsel advised that the District continued to refuse to develop a BIP for Z.P. or to provide additional speech-language therapy beyond articulation.  The Parent's counsel continued to raise issues contained in the emergent relief motion, but the ALJ still would not decide the emergent relief motion, and in fact, never did.

272.    On February 9, 2020, Dr. Hilsen observed Z.P. at school for a second time, after which she issued an updated report, in the record as J-61, that included all the data she had collected on Z.P.'s behavior in class.

273.    The data included the frequency, or number of times, Dr. Hilsen observed Z.P. being non-compliant or requiring prompting in class.  These two targeted behaviors were specifically defined:

a) Non-compliance- Defined as any time Z.P.  was told to do something or go somewhere in which he did not follow the direction the first time presented.

b) Prompting- Defined as any time Z.P. needed a verbal cue or a physical, faded physical, or gestural cue in order to comply with the task.

274.    Based on the data and her own observations, Dr. Hilsen determined that a formal behavior intervention plan was warranted due to the number of times Z.P. needed to be prompted and redirected to comply with tasks or to remain on task during non-preferred activities.

275.   The District did not revise the December 16, 2019 IEP to include a BIP or goals and objectives to address the targeted behaviors of non-compliance and prompting, neither of which had associated goals and objectives Z.P.'s IEP.

276.   Dr. Hilsen gave detailed testimony at the hearing about Z.P.'s problematic behavior that she observed, and more importantly, how the District's staff's responses were not only ineffective, they reinforced Z.P.'s non-compliance.

277.   Dr. Hilsen also testified that certain maladaptive behaviors were the result of Z.P.'s sensory processing problems including throwing objects, flailing his arms and bumping into classmates, and hiding under a table when told to sit down.  She described simple interventions the staff could have used to control the behaviors, but did not.

278.   Although he found Dr. Hilsen qualified as an expert in, "special education in Applied Behavioral Analysis (ABA) in the education of pre-school students and in the education of students with autism", the ALJ's opinion did not consider or address any of Dr. Hilsen's direct testimony cited by the Parent or any arguments raised in the Parent's post-hearing brief.  Instead, Dr. Hilsen's evidence, both documentary and testimonial, was dismissed by copying the District's brief.

279.   Moreover, the ALJ accepted the District's argument, made without any foundation and unsupported by any testimony or other evidence, that behavioral interventions for children used in school are different from ones used in other settings, therefore Dr. Hilsen's opinions should be discounted.

**THE ALJ'S DECISION**

280.   Right from the beginning of the decision, the ALJ demonstrates that he does not "possess requisite knowledge and ability to understand the provisions of the IDEA, Federal and

State regulations pertaining to the IDEA and legal interpretation of the IDEA" as required by 20 U.S.C. §1415(f)(3)(A)(ii).

281.    Under the heading "Procedural History," he writes,

On March 9, 2020, the Governor of the State of New Jersey issued Executive Order 103, declaring a public health emergency, due to the COVID-19 pandemic. The Governor's Executive Order 127 authorized the extension of time for the completion of administrative decisions, after the public health emergency. Subsequent Executive Orders have extended the public health emergency, which continues as of the date of this initial decision. The filing of this decision was delayed partially due to illness of the tribunal and due to the COVID-19 public health emergency.

282.    The OAL hears special education cases under the IDEA, a federal law. At the beginning of the COVID-19 pandemic, the Secretary of the U.S. Department of Education issued guidance that the IDEA's timelines remained in effect.

283.    The Governor of the State of New Jersey does not have authority to extend the time for the issuance of decisions under the IDEA. In addition, unlike most decisions issued by the OAL, special education decisions are final under 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. § 300.514, not initial decisions as the ALJ writes here.

284.    As previously noted, the ALJ's recitation of testimony in this case is almost entirely a verbatim copy of the District's post-hearing brief.

285.    The District had both the burden of proof and of production, and the first witness called was Dr. Laura Nash, who became Z.P.'s case manager. She was qualified as an expert in special education and an expert school psychologist.

286.    The case manager testified she was only "vaguely" aware of the Autism Program Quality Indicators ("APQI") published by New Jersey Department of Education, and she resisted agreeing with even the most basic characteristics of children with an Autism Spectrum Disorder –

that they have difficulties in socialization, communication, attention, and imitation. The APQI is in the record as J-77.

287. The ALJ's opinion never mentions the detailed questioning of the case manager about the APQI, which states it was the result of work of a panel of nearly three dozen autism experts and describes effective models of educating young students with autism and notes that effective interventions in school for students with ASD emphasize not only knowledge and skill acquisition, but also on socialization, language and communication, the reduction of problem behaviors, and adaptive skills. Instead, the ALJ merely accepted the case manger's statement that the APQI only contained recommendations and was not part of the administrative code, so she did not have to be familiar with its contents.

288. The APQI has detailed recommendations for assessing students with ASD, and the case manager's lack of understanding of how to properly assess those students was clearly demonstrated by the fact that at the January 15, 2019 initial identification meeting, the District did not observe Z.P. with same-age peers. The case manager was questioned in detail about the recommendations in the APQI regarding individual student assessment including that, "it is particularly important to thoroughly assess the student's social skills with peers", but the opinion ignores this evidence.

289. Dr. Hilsen, who was qualified as an expert in special education and Applied Behavior Analysis testified that preschool students with ASD are usually very comfortable interacting with adults, but need intense instruction to be able to interact with peers. That testimony is not considered in the ALJ's opinion.

290. The opinion recites that the case manager identified the five developmental areas that the administrative code lists in assessing preschool-age children for eligibility for special

education: intellectual, communication, social and emotional, adaptive, and physical.  The opinion goes on to list the areas in which Z.P. has strengths including his cognitive abilities and that he is able to seek help from adults.  The opinion ignores documentary evidence of Z.P.'s inability to communicate and socialize, particularly with peers.

291.    The IDEA has very specific steps in its comprehensive scheme for ensuring that children with disabilities are provided a free appropriate public education.  Those steps include, referral, identification, evaluation, eligibility determination, and the development of an IEP to meet the child's unique needs.  Each of those steps have defined timelines, require specific participants, and explicit written notice provisions.  The ALJ's opinion shows a lack of understanding of those steps and how they must be completed.

292.    Z.P was referred to the District by the EI transition planning team for consideration for eligibility for special education.  The January 15, 2019 meeting was an initial identification meeting as required by N.J.A.C. 6A:14-3.3(e) to determine whether to evaluate him for eligibility for special education and related services.

293.    An identification meeting is not the same thing as an IEP meeting and requires different participants, yet the ALJ's opinion describes almost all meetings the Parent attended with District personnel as IEP meetings.

294.    The District failed on several occasions to provide required notices, and documents evidencing those failures are part of the record in this case, but are not included in the ALJ's opinion.  For example, written notice of the purpose of meetings is required, and the case manager only sent the Parent an email inviting her to the March 11, 2019 meeting describing it as, "another evaluation planning meeting."  Written consent from a parent is required to begin an evaluation, and at evaluation planning meetings, the Child Study Team informs parents of what areas they

plan to assess then seeks consent. The Parent only learned when she arrived at the meeting that the case manager intended to begin the evaluations, and the Parent was not available to stay the amount of time needed for that.

295.    The ALJ's opinion describes the case manager's testimony about the incident as the District knew it would agree to evaluate Z.P. and wanted to move quickly to address his needs and the Parent's concern, but impliedly faults the Parent for not permitting them to evaluate that day. This ignores the fact that the District didn't give proper notice as well as the Parent's testimony, supported by the case manager's email, that she had no reason to expect the District would agree to evaluate that day.

296.    The credibility of the case manager's claim that the District wanted to move quickly to meet Z.P.'s needs is disproven by documentary evidence that shows that after receiving consent for the evaluation on March 11, 2019, it did not conduct any evaluation until March 27th, and although the last evaluation was conducted April 5th, it did not hold an eligibility determination meeting until May 24, 2019, two and a half months later.

297.    In addition, the notice the District gave the Parent at the end of that eligibility determination meeting, which is in the record as J-94, only lists concerns that the Parent expressed at the meeting and states that the team will get back to her, but does not contain an eligibility determination. The District was required to make a determination and provide the reasons it found Z.P. ineligible as well as list the procedures, tests, records or reports and factors it used to make that determination pursuant to N.J.A.C. 6A:14-2.3(g).

298.    The ALJ's opinion simply accepted the District's conclusions as testified to by the case manager even when they were illogical. An example is the description on page 8 that states that as part of the observation of him in the two-year olds' class on March 27, 2019, Z.P. scored

an 82 on an assessment of his social and emotional development in school. The opinion states that this score is categorized as below average and at the 12th percentile rank, and that average scores are between 90 and 110. It then states that the case manager, "testified that these (sic) scores (sic) are (sic) not significant for eligibility purposes according to the New Jersey Special Education Code." There is no analysis or explanation of why such a low score in an area in which children with ASD are known to have deficits is not significant, nor is it ever connected with the eligibility criteria in the administrative code.

299.   That is also one of many sections of the opinion with errors copied from the District's post-hearing brief:

> Dr. Nash testified that while Z.P.'s performance was technically in the below average range, it was not such so significant that the team had a concern at the moment regarding his eligibility. Dr. Nash also testified that given the team's observation wherein Z.P. was appropriately engaging with other students.

300.   As noted in paragraph 138 above, the ALJ permitted hearsay testimony from the case manager that Z.P. did not meet the criteria necessary to receive speech-language services in school, but the case manager was not able to identify what those criteria were.

301.   The District called Amanda Gagnon, the speech-language therapist who reassessed Z.P. in the fall of 2019 and provided articulation therapy to him in 2020, as a witness, but did not elicit testimony as to the criteria for speech-language services in school.

302.   As a result, the District did not meet its burden of proof regarding its finding that Z.P. was ineligible for speech-language services in school.

303.   When the Parent's counsel proffered Debra Levin, a senior speech-language pathologist at CHOP, as an expert in speech-language pathology particularly in the area of pediatric speech-language pathology including diagnosis and intervention, the District's counsel objected, claiming without foundation, that she did not have expertise in interventions in a school

setting and should not be permitted to testify at all about speech-language services to be provided there.

304.    Ms. Levin, a licensed speech-language pathologist since 1997, testified that after diagnosing a child's speech-language deficits, she often recommends speech-language services in school, especially for children with ASD because it is a natural environment in which to gain skills in communication and social interaction with peers.

305.    The District's counsel did not ask to *voir dire* Ms. Levin on her qualifications or expertise.  After some colloquy on the proffer, the ALJ found Ms. Levin to be an expert in diagnosis and interventions as a speech-language pathologist working at CHOP, and that the Parent's counsel could elicit testimony about recommendations she makes for interventions in a school setting.  The ALJ also acknowledged that the District's counsel could cross-examine on such testimony.

306.    The ALJ further agreed that he would determine the weight of Ms. Levin's testimony.

307.    The opinion, however, incorrectly states that Ms. Levin had been precluded from testifying regarding decisions made by District staff about the need for speech-language services in a school setting, apparently confusing the difference between the weight given to evidence and its admissibility.

308.    The opinion also disparages Ms. Levin's testimony regarding speech-language evaluations conducted by the District because she was not present for those evaluations even though the evaluations consisted of standardized assessments Ms. Levin testified she herself is qualified to administer and regularly does in her practice.  Such standardized assessments are supposed to produce objective information.

309.   There is no legal basis in an IDEA case to preclude expert testimony about reports of the administration and results of standardized assessments merely because the expert is not employed in a school.  If there were, it would effectively prevent parents of children with disabilities from ever prevailing in a special education matter.

310.   The opinion similarly recites the case manager's dismissive testimony that while she received many reports from Z.P.'s private physicians at CHOP, none of these providers ever observed Z.P. in the District, and that their recommendations were based upon their own observations of him and parent input.  As a board-certified neurodevelopmental pediatrician, Dr. Bennett is qualified to diagnose and treat an Autism Spectrum Disorder, something no District staff are qualified to do.  The fact that Dr. Bennett works at CHOP as the Clinical Chair of the Autism Integrated Care Program rather than in a school is not a valid reason to disregard her recommendations for interventions outside a hospital setting.

311.   The opinion also ignores non-testimonial extrinsic evidence that supports Z.P.'s need to have a BIP added to his IEP.  Among evidence the ALJ did not consider were exhibits concerning Z.P. being physically restrained in school.  The District's own policy and regulation involving the use of physical restraint on students with disabilities are in evidence as J-46 and J-47.  The policy requires that each incident of physical restraint be, "documented in writing in sufficient detail to enable staff to use this information to develop of improve the behavior intervention plan" at the next IEP meeting.  It also states that a school district "shall attempt to minimize the use of physical restraints through inclusion of positive behavior supports in the student's behavior intervention plan developed by the IEP team."

312.    That policy, as well as guidance from the U.S. Department of Education on the use of physical restraint, was included in the motion for emergent relief seeking an order requiring the District to develop a BIP for Z.P. which the ALJ never decided.

**COUNT I**
**(Reversal of the ALJ's March 30, 2021 Order**
**<u>Dismissing Portion of Due Process Petition)</u>**
**AS AGAINST THE DISTRICT**

313.    The Parent repeats each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

314.    As of January 15, 2019, the District had a legal obligation to evaluate and develop an IEP for Z.P. because he was eligible for special education and related services and should have started receiving services no later than his third birthday on March 22, 2019.

315.    The District did not issue an IEP for Z.P. until August 8, 2019, by which time he had missed approximately three months of the regular school year 2018-2019 and the summer of 2019 Extended School Year program.

316.    On March 30, 2021, the ALJ issued a final decision and entered an Order dismissing most of the Parent's Due Process Petition finding that the District did not deny Z.P. a FAPE when it first found him ineligible eligible for special education and related services, and that the IEPs it developed for him in August 2019 and December 2019 did offer Z.P. a FAPE.

317.    Although the final decision purports to provide a summary of the testimony and evidence that was not a verbatim recitation of the testimony, the majority of the decision is copied verbatim from the District's post-hearing brief and contains an incomplete and inaccurate summary of both testimonial and documentary evidence.

318. The ALJ simply ignored the testimony of many witnesses, including ones he found qualified as experts, and issued a decision that was inconsistent with the documentary record that was introduced into evidence during the due process hearing.

319. In agreeing with the District's determination that it did not need to evaluate Z.P. in January 2019 and that he was not eligible for special education and related services until August 8, 2019, and that the August 2019 and December 2019 IEPs the District developed provided Z.P. with a FAPE, the ALJ made numerous errors of law which include but are not limited to:

a) Failing to engage in any analysis of the criteria for special education eligibility contained in 34 C.F.R. § 300.306 and N.J.A.C. § 6A:14-3.5(c) in evaluating the District's "determination" that Z.P. was ineligible for special education until August 8, 2019.

b) Ignoring the District's violation of its "child find" obligations under 20 U.S.C. §1412(a)(3), 34 C.F.R. §300.311, and N.J.A.C. §6A:14-3.3(a).

c) Ignoring the District's failure to evaluate Z.P. in all areas of suspected disability in violation of 34 C.F.R. § 300.304(c)(4) and N.J.A.C. § 6A:14-3.4(f).

d) Erroneously relying on the testimony of witnesses who offered only anecdotal observations, unsupported by any data, of Z.P.'s progress toward the goals and objectives in his IEP, and their interpretation of subjective progress reports that were never provided to the Parent that Z.P. was making consistent, meaningful progress during the 2019-2020 school year.

e) Making erroneous credibility determinations based on mischaracterizations of witnesses' testimony and which were inconsistent with the non-testimonial extrinsic evidence in the administrative record.

320. When a court "adopts a party's proposed opinion as its own, the court vitiates the vital purposes served by judicial opinions." *Bright v. Westmoreland County*, 380 F.3d 729, 732 (3d. Circ. 2004).

WHEREFORE, Plaintiff A.C., individually and on behalf of her minor son Z.P., demands judgment in their favor and against the Defendant West Windsor-Plainsboro Regional Board of Education as follows:

a) Reversing the ALJ's March 30, 2021 final decision in its entirety;

b) Declaring and Adjudging that Z.P. was eligible for special education and related services as of his third birthday on March 22, 2019;

c) Declaring and Adjudging that the District failed to provide Z.P. with a free appropriate public education ("FAPE");

d) Declaring and Adjudging that the District has an obligation to provide Z.P. with compensatory education equal to the period of deprivation (i.e., March 22, 2019 through the 2020-2021 school year) where a FAPE was not provided because the District at first found Z.P. ineligible and later issued inadequate IEPs for him;

e) Awarding A.C. reimbursement of costs she incurred providing Z.P. with services the District was obligated to have provided including speech-language therapy, private preschool programming, and intervention from BCBAs;

f) Awarding reasonable attorneys' fees, costs, expenses, and expert fees, incurred in connection with the filing of the due process petition, the proceedings before the Office of Administrative Law, and in connection with this action; and

g) Awarding such other relief as the Court deems just and equitable.

**COUNT II**
**(Violation of Section 504 of the Rehabilitation Act of 1973)**
**AS AGAINST THE DISTRICT**

321.   The Parent repeats each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

322.   The District received federal funds and is, therefore, a covered entity within the meaning of Section 504 of the Rehabilitation Act of 1973 (hereinafter "Section 504").

323.   Z.P. has impairments that substantially limit and affect his major life activities and is, therefore, a disabled person with the meaning of Section 504.

324.   Section 504 imposed upon the District a duty to provide Z.P. with a FAPE, that includes both the provision of special education and related services no later than his third birthday, and safe implementation of the related service of transportation.

325.   The District violated the aforesaid duty.

326.   The District violated Z.P.'s right to be free from discrimination on the basis of his disabilities by denying him full and equal access to the District's programs and activities.

WHEREFORE Plaintiff A.C. individually and on behalf of her minor son Z.P. demands judgment in their favor and against the Defendant West Windsor-Plainsboro Regional Board of Education for an Order:

a) Declaring and adjudging that the District violated Z.P.'s rights under Section 504 of the Rehabilitation Act of 1973;

b)     Awarding reasonable attorney's fees and costs, including expert costs, incurred in the administrative proceedings below and in this action pursuant to 29 U.S.C. § 794a(b); and

c)     Awarding such other relief as the Court deems just and equitable.

**COUNT III**
**(Declaratory Judgment Action – 28 U.S.C. §2201 et. seq.)**
**AS AGAINST THE DISTRICT**

327.    The Parent repeats each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

328.    On January 15, 2019, as Z.P. was about to age out of eligibility for the Early Intervention Services he had been receiving, the District convened an initial identification meeting as required by N.J.A.C. 6A:14-3.3(e) to determine whether to evaluate him for eligibility for special education and related services.

329.    An identification meeting is not the same thing as an IEP meeting and requires different participants.

330.    At the January 15, 2019 meeting, without observing Z.P. interact with peers or conducting any formal assessments, the District determined that Z.P. did not qualify for special education and related services and it would not conduct an evaluation.

331.    The Parent had to file a request for mediation in order to have the District agree to conduct an evaluation for eligibility for special education and related services.

332.    The parent had to file a second request for mediation in order to have the District to conduct an appropriate structured observation of Z.P., a required part of an evaluation for eligibility for special education and related services.

333.    Following that second observation, the District found Z.P. eligible and developed an IEP for him, but refused to provide him with necessary speech-language services.

334.    Since February 2019, the Parent and the District have had an ongoing dispute over: whether the District properly considered the reports and recommendations of the experts at CHOP when the District refused to evaluate Z.P.; whether the District should have found Z.P. eligible for

special education no later than his third birthday; and whether the IEPs developed for him met his unique needs as required by the IDEA.

335.    On May 29, 2019, the Parent filed a petition for mediation with the New Jersey Department of Education, Office of Special Education Programs, challenging the District's determination that Z.P. was not eligible for special education and related services.

336.    In that petition, the Parent specifically requested that the IEP team reconvene the following week to collaboratively develop an IEP for Z.P.

337.    The District did not agree to reconvene and reconsider its eligibility determination until after the Parent retained counsel and had her mediation-only petition converted to one for a due process hearing and have that petition transmitted to the OAL for adjudication.

338.    On August 8, 2019, the District issued an IEP for Z.P. as aforesaid.

339.    The issuance of the IEP, however, did not resolve the dispute between the Parent and the District over whether the District must develop an IEP for Z.P. that takes into consideration the recommendations of the Parent's experts.  Believing that the IEP proposed by the District was better than the alternative of having Z.P. receive no services, the Parent consented to its implementation while specifically noting that she disagreed with the District's refusal to provide speech-language services.

340.    The Parent's concern that Z.P. would have maladaptive behavioral outbursts in school resulting from being frustrated by his inability to communicate came true shortly after the school year began.

341.    The Parent asked the District to develop a Behavior Intervention Plan for Z.P., but the District refused, and continues to refuse to provide such a plan for him.

342.    After Z.P.'s behavior resulted in him being physically restrained in school, the Parent also requested that the District have a BCBA assist in determining appropriate behavior interventions, but the District refused.  The Parent retained a BCBA-D privately to do what the District should have done.

343.    Z.P. continues to have maladaptive behaviors in his school program and during follow up visits with Dr. Bennett.  The Parent has provided the District with Dr. Bennett's updated recommendation that Z.P. requires the participation of a BCBA and both a Behavior Intervention Plan and a Crisis Intervention Plan.  In spite of that and of repeated requests from the Parent, the District continues to refuse to assign a BCBA to assist him or to include a BIP in his IEP.

344.    Z.P. also has life-threatening asthma and allergies.  The Parent has submitted multiple documents to the District from Dr. Rahul Datta, Z.P.'s treating physician at CHOP, stating that he needs both an epi-pen and an inhaler available to him at all times including on the school bus, yet the District continued to refuse to allow Z.P.'s rescue medications on the bus with him in violation of statutes, regulations and the District's own policies.

345.    The ALJ's opinion inadequately describes the Parent's request for relief regarding the failure to provide safe transportation and writes that the request is granted, but then equivocates and states it is, "to the extent that this issue has not been adequately dealt with by the district and a revised analysis of Z.P.'s diagnosis of allergy and asthma shall be re-undertaken to determine his appropriate transportation needs."

346.    The Parent submitted detailed, uncontroverted documentary evidence in support of her request and is entitled to a clear decision and order that the District must comply with Z.P.'s physician's orders, state statutes and regulations and the District's own policies implementing those statutes and regulations as part of its obligation to provide Z.P. a FAPE.

347.    The Parent has exhausted her administrative remedies, and there still remains an actual, substantial, and continuing justiciable controversy between the Parent and the District with regard to the District's obligation to develop an IEP that is commensurate with the recommendations of Dr. Bennett, and her team at the Autism Integrated Care Program at CHOP, Debra H. Levin, M.A., CCC-SLP, Dr. Lindsay Hilsen, BCBA-D, and Dr. Rahul Datta such that this Court may entertain the Parent's request for declaratory relief consistent with Article III of the United States Constitution.

348.    Pursuant to 28 U.S.C. § 2201, the Parent is entitled to prospective relief in the form of a declaratory judgment that settles the dispute regarding the provision of services to Z.P. on a going forward basis by declaring and adjudging that the District is obligated to develop and implement an IEP for Z.P. that is commensurate with the recommendations of the Parent's experts and awarding the Parent reimbursement for tuition and other costs associated with Z.P.'s unilateral preschool placement that commenced in March 2019.

WHEREFORE, Plaintiff A.C. individually and on behalf of her minor son Z.P. demands judgment in their favor and against the Defendant West Windsor-Plainsboro Regional Board of Education for an Order:

a) Declaring and adjudging that the District must develop an IEP for Z.P. that is commensurate with the recommendations of Amanda E. Bennett, M.D., M.P.H. and her team at CHOP, Debra H. Levin, M.A., CCC-SLP, Lindsay Hilsen, Ed.D., BCBA-D, and Rahul Datta, M.D. Ph.D.;

b)     Awarding tuition reimbursement, reimbursement of the costs of retaining a BCBA and other costs associated with Z.P.'s placement in a private preschool program as of his third birthday;

c)       Awarding reasonable attorney's fees and costs, including expert costs, incurred in the administrative proceedings below and in this action; and

d)       Awarding such other relief as the Court deems just and equitable.

**COUNT IV**
**(Violation of Americans with Disabilities Act of 1990 ("ADA"),**
**42 U.S.C. § 12101 *et seq.*)**
**AS AGAINST THE DISTRICT**

349.     The Parent repeats each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

350.     Z.P. is a qualified individual within the meaning of the ADA.

351.     The ADA defines "disability" as a physical or mental impairment that substantially limits one or more major life activities, including but not limited to, learning, reading, concentrating, thinking, and communicating.

352.     Z.P.. was excluded from participation in, or denied benefits of, services, programs, or activities for which the Defendant West Windsor-Plainsboro Regional Board of Education, a public entity, was responsible, or was otherwise being discriminated against by the West Windsor-Plainsboro Regional Board of Education.

353.     The exclusion, denial of benefits, or discrimination was by reason of his disability.

WHEREFORE Plaintiff A.C. individually and on behalf of her minor son Z.P. demands judgment in their favor and against the Defendant West Windsor-Plainsboro Regional Board of Education for an Order:

a) Declaring and adjudging that the District violated Z.P.'s rights under Title II of the Americans with Disabilities Act of 1990;

b)      Awarding reasonable attorney's fees and costs, including expert costs, incurred in the administrative proceedings below and in this action pursuant to 42 U.S.C. § 12101 et seq.); and

c)      Awarding such other relief as the Court deems just and equitable.

## COUNT V
### (Violation of Plaintiffs Right to an Impartial Due Process Hearing under the Individuals with Disabilities Education Act (IDEA) and N.J.A.C. 6A:14-1 et seq.)
### AS AGAINST THE N.J. DEPARTMENT OF EDUCATION

354.    The Parent repeats each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

355.    NJDOE, as a State Education Agency (SEA), receives federal funding and is, pursuant to 20 U.S.C. §1415(a), charged with responsibility to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education . . . ."

356.    As required by the IDEA, in New Jersey, the Department of Education refers matters involving disputes in under special education laws and regulations to the OAL for a due process hearing and the issuance of a final decision pursuant to N.J.A.C. 6A:14; N.J.A.C. 1:6A-1.1. *See also* 34 C.F.R. 300.507.

357.    NJDOE has failed to ensure that special education disputes referred to the OAL comply with the IDEA's procedural safeguards to the detriment of Plaintiff and Z.P.

358.    In the State of New Jersey, the District has the burden of proof and the burden of persuasion to demonstrate the provision of FAPE. *Lascari v. Board of Education of Ramapo Indian Hills Regional High School District*, 116 N.J. 30 560 A.2d 1180 (1989); N.J.S.A. 18A:46-1.1.

359. The decision below improperly shifted the burden of proof and persuasion from the Defendant onto the Plaintiff.

360. Plaintiff's primary complaints, that the District's failure to properly evaluate Z.P., find him eligible for special education programs and services, and to develop and implement IEPs that would provide him the opportunity to make meaningful education progress in light of his circumstances denied Z.P. a FAPE, were properly presented in the due process petition. 20 U.S.C. §1415(a)(6).

361. Administrative law judges must possess requisite knowledge and ability to understand the provisions of the IDEA, Federal and State regulations pertaining to the IDEA and legal interpretation of the IDEA under 20 U.S.C. §1415(f)(3)(A)(ii).

362. Administrative law judges must possess the knowledge and ability to conduct the hearing in accordance with appropriate standard legal practice or actions or possess the knowledge, and ability to render and write decisions in in accordance with appropriate standard legal practice or actions under 20 U.S.C. §1415(f)(3)(A)(iii)-(iv).

363. Any person conducting special education hearings must possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice under 20 U.S.C. §1415(f)(3)(A)(iv).

364. Administrative law judges' written decisions must contain findings of fact and conclusions of law that are based upon "sufficient, competent and credible evidence" under N.J.S.A. 52:14B-10(c).

365. The ALJ's decision and order in this case repeatedly shows that he does not possess the requisite knowledge and understanding of the IDEA and other applicable law and regulations.

366.   A review of the transcripts of the hearings as well as the fact that the ALJ failed to decide two motions for emergent relief made during the pendency of the matter show that the ALJ did not possess the knowledge and ability to conduct the hearing in accordance with appropriate standard legal practice or actions.

367.   As described in detail above, the ALJ's written decision and order in this matter does not contain findings of fact and conclusions of law that are based upon "sufficient, competent and credible evidence" as required by N.J.S.A. 52:14B-10(c).  Rather, the written decision is nearly a verbatim copy of the District's post-hearing brief.  When a court "adopts a party's proposed opinion as its own, the court vitiates the vital purposes served by judicial opinions." *Bright v. Westmoreland County*, 380 F.3d 729, 732 (3d. Circ. 2004)

368.   NJDOE's violation of IDEA and N.J. statute and administrative code has denied the Parent's right to an impartial due process hearing and damaged both the Parent and Z.P.

369.   This Court has the authority to vacate the decision below and wide discretion to grant appropriate relief including but not limited to entry of a declaratory judgment, awarding reimbursement for compensatory education and experts' costs, and attorney's fees.

WHEREFORE Plaintiff A.C. individually and on behalf of her minor son Z.P. demands judgment in their favor and against the Defendant New Jersey Department of Education for an Order:

a)  Reversing the ALJ's March 30, 2021 final decision in its entirety;

b)   Declaring and Adjudging that Z.P. was eligible for special education and related services as of his third birthday on March 22, 2019;

c)   Declaring and Adjudging that Z.P. was denied a FAPE as of his third birthday;

d)        Declaring and Adjudging that Z.P. is entitled to compensatory education equal to the period of deprivation (i.e., March 22, 2019 through the 2020-2021 school year) as a result of a continuing denial of a FAPE;

e)        Awarding A.C. reimbursement of costs she incurred providing Z.P. with services the District was obligated to have provided including speech-language therapy, private preschool programming, and intervention from BCBAs;

f)        Awarding reasonable attorneys' fees, costs, expenses, and expert fees, incurred in connection with the filing of the due process petition, the proceedings before the Office of Administrative Law, and in connection with this action; and

g)        Awarding such other relief as the Court deems just and equitable.

**COUNT VI**
**<u>(Violation of Plaintiff's Due Process Right to a Timely Final</u>**
**<u>Decision under the Individuals with Disabilities Education Act</u>**
**<u>(IDEA) and N.J.A.C. 6A:14-1 et seq.)</u>**
**AS AGAINST THE N.J. DEPARTMENT OF EDUCATION**

370.    The Parent repeats each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

371.    NJ-DOE, as a State Education Agency (SEA), receives federal funding and is, pursuant to 20 U.S.C. §1415(a), charged with responsibility to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education . . . ."

372.    NJ-DOE has failed, and continues to fail to ensure, the timely resolution of special education disputes, as required by federal and state law.  20 U.S.C. §1415(f); N.J.A.C. 6A:14-2.7.

373.    The law requires a final decision to be rendered in due process cases within 45 days after the end of the 30-day resolution period.  34 C.F.R. 300.515(a); N.J.A.C. 6A:14-2.7(j).

374.    NJ-DOE has failed to ensure the timeliness in special education due process hearings are met, as required by federal and state law.  20 U.S.C. §1415(f); N.J.S.A. 52:14B-10; N.J.A.C. 6A:14-2.7.

375.    From the time the mediation-only request was converted to a due process petition and transmitted to the Office of Administrative Law on June 10, 2019, until a final decision was reached, on March 30, 2021, 660 days elapsed, including 144 days between the close of the record on November 7, 2020 and the issuance of the final decision on March 30, 2021.  This delay "crossed the line from minor, non-actionable delays to [a] delays so significant that [it] deprived [Plaintiff] of the substantive rights guaranteed to [her] by the IDEA."  See *C.P. et al. v. Dep't of Edu. et al.* (D.N.J. No. 1:19-cv-12807) [ECF #98 at 28], 76 IDELR 214, (denying motion to dismiss).

376.    NJDOE's violation of IDEA and N.J. statute and administrative code has damaged A.C. and Z.P.

377.    This Court has the authority to vacate the decision below and wide discretion to grant appropriate relief including but not limited to entry of a declaratory judgment, awarding reimbursement for compensatory education and experts' costs, and attorney's fees.

WHEREFORE Plaintiff A.C. individually and on behalf of her minor son Z.P. demands judgment in their favor and against the Defendant New Jersey Department of Education for an Order:

a)  Reversing the ALJ's March 30, 2021 final decision in its entirety;

b)      Declaring and Adjudging that Z.P. was eligible for special education and related services as of his third birthday on March 22, 2019;

c)      Declaring and Adjudging that Z.P. was denied a FAPE as of his third birthday;

d)      Declaring and Adjudging that Z.P. is entitled to compensatory education equal to the period of deprivation (i.e., March 22, 2019 through the 2020-2021 school year) as a result of a continuing denial of a FAPE;

e)      Awarding A.C. reimbursement of costs she incurred providing Z.P. with services the District was obligated to have provided including speech-language therapy, private preschool programming, and intervention from BCBAs;

f)      Awarding reasonable attorneys' fees, costs, expenses, and expert fees, incurred in connection with the filing of the due process petition, the proceedings before the Office of Administrative Law, and in connection with this action; and

g)      Awarding such other relief as the Court deems just and equitable.

## COUNT VII
### (Reimbursement of Attorneys' Fees and Costs – 20 U.S.C. §1415(i)(3)(B))

378.    The Parent repeats each and every allegation of the foregoing paragraphs as if fully set forth at length herein.

379.    The Parent commenced this action appealing the March 30, 2021 decision of the Hon. Carl V. Buck, III, ALJ.

380.    The Parent was partially successful in the administrative hearing.

381.    Pursuant to 20 U.S.C. §1415(i)(3)(B), the Parent is entitled to make application for reimbursement of reasonable counsel fees and costs incurred in connection with this action and the administrative proceedings below if she is successful in her appeal.

WHEREFORE Plaintiff A.C., individually and on behalf of her minor son Z.P. demands judgment in her favor and against the Defendant West Windsor-Plainsboro Regional Board of Education for an Order:

a) Awarding reasonable attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B); and

b) Awarding such other relief as the Court deems just and equitable.

### CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

Mandatory arbitration pursuant to Local Rule of Civil Procedure 201.1 is not appropriate in this case because Plaintiff seeks relief other than money damages.

### CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to L. Civ. R. 11.2, I hereby certify that the within action is not the subject of any other action pending in any Court, or of any pending arbitration, although since this matter involves a five year-old who is eligible for special education and related services, an administrative proceeding regarding events subsequent to the ones that are the subject of this action is pending.

Dated: June 26, 2021

                                    s/ Denise Lanchantin Dwyer
                                    Denise Lanchantin Dwyer, Esq.
                                    Attorney for Plaintiff

Law Office of Denise Lanchantin Dwyer LLC
5 Duxbury Court Princeton Junction, New Jersey 08550-2137
Tel. 609-632-0475
Fax 609-632-1255
e-mail Denise@DLDwyerLaw.com
Attorney ID #009852005
Attorney for Plaintiff

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| A.C., individually and on behalf of Z.P.,     ) | **Civil Action No.:** |
|     ) | |
|     Plaintiff,     ) | |
|     ) | |
| v.     ) | **VERIFICATION** |
|     ) | |
| WEST WINDSOR-PLAINSBORO     ) | |
| REGIONAL BOARD OF EDUCATION,     ) | |
| NEW JERSEY DEPARTMENT OF     ) | |
| EDUCATION; ANGELICA ALLEN-     ) | |
| MCMILLAN, Acting Commissioner of     ) | |
| Education, in her official capacity,     ) | |
|     ) | |
|     ) | |
|     Defendants.     ) | |
|     ) | |

I, Allison P. Carrozzi, being of full age, certify as follows:

I am the Plaintiff in the foregoing matter.

I have read the complaint and the allegations therein are true of my own knowledge, except as to matters stated on information and belief, and those matters are true to the best of my knowledge and belief.

I certify that the foregoing statements made by me are true. I am aware that if any of the statements are willfully false, I am subject to punishment.

Dated: June 26, 2021

_____
Allison P. Carrozzi