*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| A.C. o/b/o Z.P.,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>WEST WINDSOR-PLAINSBORO BOARD OF EDUCATION, *et al.*,<br><br>　　　　　　Defendants. | Civil Action No. 21-13016 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge**:

Presently before the Court are three separate motions: (1) a motion for summary judgment filed by Plaintiff A.C., on behalf of her son, Z.P. ("Plaintiff"); (2) a cross-motion for summary judgment filed by Defendant West Windsor-Plainsboro Board ("Defendant" or the "District"); and (3) a motion to dismiss filed by the New Jersey Department of Education (the "DOE"). These motions arise out of Plaintiff's appeal of Administrative Law Judge Carl F. Buck's ("ALJ") decision to dismiss Plaintiff's due process petition, which claimed, among other things, that the District violated Z.P.'s right to a free, appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*

For the reasons that follow, the DOE's motion to dismiss is **GRANTED**, and Count Five is dismissed; the District's Motion for Summary Judgment is **GRANTED** in part, and **DENIED** in part; and Plaintiffs' Motion for Summary Judgment is **GRANTED** in part, and **DENIED** in part. Specifically, the Court remands this matter for: (1) further proceedings related to Z.P.'s sensory issues; (2) amendment of Z.P.'s IEP to include that he be permitted to carry his allergy medication on the bus, and further, that he be entitled to the assistance of an aide on the bus

appropriately trained to administer the epinephrine and his inhaler; and (3) a determination by the ALJ regarding the extent of compensatory education appropriate between March 22, 2019 and August 8, 2019, based on the Court's finding that Z.P. was entitled to special education for that period under N.J.A.C. 6A:14-3.5(c)(10)(ii). All other determinations made by the ALJ are **AFFIRMED**.

### I. <u>BACKGROUND</u>

#### A. <u>The Individuals with Disabilities Education Act</u>

Before I recount the relevant facts, an overview of the statutory framework is necessary. The IDEA, 20 U.S.C. § 1401 *et seq.*, is designed "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). The IDEA requires states that receive federal education funding to provide every disabled child with a FAPE. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017) (citing 20 U.S.C. § 1400, *et seq.*). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268–69 (3d Cir. 2012) (internal quotation marks omitted). While a state is not required to maximize the potential of every disabled child, it must provide more than *de minimus* progress each year. *Endrew F*, 137 S. Ct. at 1001. Accordingly, school districts must offer an Individualized Education Program ("IEP") that is "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *K.D. ex rel. Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018) (quoting *Ridley Sch. Dist.*, 680 F.3d at 269).

"An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010). It must not be a "form document." *Endrew F.*, 137 S. Ct. at 999. Thus, an IEP "turns on the unique circumstances of the child for whom it is created." *Id.* at 1001. For a child integrated into a regular classroom, an IEP is usually "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 999 (quoting *Bd. of Ed. of Hendrick Hudson Ctr. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203-04 (1982)). And while parents often play a role in the development of an IEP, they do not have a right to compel a school district to provide a specific program or employ specific methodology in educating a student. *See Ridley Sch. Dist.*, 680 F.3d at 269, 278.

New Jersey has enacted legislation to ensure that students with disabilities can access a FAPE as required by the IDEA. To be eligible for special education in New Jersey, a student must satisfy three requirements: (1) the student must be found to have one or more of the enumerated disabilities; (2) the disability must adversely affect the student's educational performance; and (3) the student must be in need of special education and related services. N.J.A.C. 6A:14-3.5(c). The enumerated disabilities include a specific learning disability ("SLD"), which exists "when a severe discrepancy is found between the student's current achievement and intellectual ability" in eight academic areas: basic reading skills, reading comprehension, oral expression, listening comprehension, mathematical calculation, mathematical problem solving, written expression, and reading fluency. N.J.A.C. 6A:14-3.5(c)(12). The list of qualifying disabilities also includes "other health impairment," which is defined as follows:

> [A] disability characterized by having limited strength, vitality, or alertness, including a heightened alertness with respect to the educational environment, due

to chronic or acute health problems, such as attention deficit hyperactivity disorder, a heart condition, tuberculosis, rheumatic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia, diabetes, or any other medical condition, such as Tourette Syndrome, that adversely affects a student's educational performance. A medical assessment documenting the health problem is required.

N.J.A.C. 6A:14-3.5(c)(9).

The qualifying student's IEP must be developed by an IEP team and be reviewed at least annually. N.J.A.C. 6A:14-3.7(b), (i). Additionally, students classified as eligible for an IEP must be reevaluated every three years, or sooner, if conditions warrant or if the student's parent or teacher requests a reevaluation. N.J.A.C. 6A:14-3.8(a).

The IDEA provides mechanisms for an aggrieved party to submit a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). Initially, a party may bring a complaint to challenge the adequacy of an IEP through "an administrative 'impartial due process hearing.' " *Ridley Sch. Dist.*, 680 F.3d at 269 (quoting 20 U.S.C. § 1415(f)). "In New Jersey, this process entails filing a complaint and request for a due process hearing with the New Jersey Department of Education[.]" *Estate of S.B. ex rel. Bacon v. Trenton Bd. of Educ.*, No. 17-7158, 2018 WL 3158820, at *2 (D.N.J. June 28, 2018) (quoting N.J.A.C. 6A:14-2.7(c)). A party aggrieved by the outcome of the due process hearing "shall have the right to bring a civil action with respect to the complaint presented ... in a district court of the United States, without regard to the amount in controversy." 20 U.S.C § 1415(i)(2)(A). The party challenging the administrative decision in district court "bears the burden of persuasion ... as to each claim challenged." *Ridley Sch. Dist.*, 680 F.3d at 270.

B. **Factual Background**

The facts of the case are set forth in the ALJ's decision, the District's Statement of Undisputed Material Facts (ECF No. 44-3), and Plaintiffs' Statement of Undisputed Material Facts (ECF No. 45-1). The following facts are undisputed unless otherwise noted.

A.C. is the mother of Z.P., a 6-year-old student born on March 22, 2016. (Def. SUMF, ¶ 1.) On his second birthday, Z.P.'s pediatrician referred Z.P. to Early Intervention ("EI") services based on concerns related to slow language development. Z.P. received EI services four times per week, including one speech-language therapy session, one occupational therapy session, and two developmental intervention sessions. (Pl. SUMF, ¶¶ 2-5.) In October 2018, Z.P.'s EI service coordinator arranged a Transition Planning Conference with the District to facilitate Z.P.'s consideration for eligibility as a preschool child with a disability when he turned three years old. (*Id.* at ¶ 8.) At the conference, the District advised that it would schedule an identification/evaluation planning meeting closer to Z.P.'s third birthday, *i.e.*, March 22, 2019. (*Id.* at ¶ 10.)

On December 4, 2018, Z.P. was diagnosed with Autism Spectrum Disorder (ASD), Mixed Expressive/Receptive Language Disorder and Childhood Behavioral Insomnia by Amanda E. Bennett, M.D., M.P.H., a board-certified developmental pediatrician and the Clinical Chair of the Autism Integrated Care Program at the Children's Hospital of Philadelphia ("CHOP"). (Def. SUMF, ¶ 1; Pl. SUMF, ¶¶ 11-12.)

In early 2019, with Z.P.'s third birthday approaching, A.C. expressed concerns to the District regarding Z.P.'s communication skills, speech and language development, and attention issues. (Pl. SUMF, ¶ 16.) In advance of an identification meeting with the District, scheduled on January 15, 2019, A.C. provided the District copies of CHOP reports, including a speech-language

5

evaluation report that recommended that Z.P. be placed in a full-time integrated preschool program when he turned three years old. (*Id.*) In accordance with the New Jersey Administrative Code, the purpose of the identification meeting was for the District's Child Study Team ("CST") to determine whether an evaluation for eligibility for special education and related services is warranted. At the January 15th identification meeting, the District determined, without conducting any formal evaluations, or observing Z.P. interacting with peers, that Z.P. was not eligible for special education and related services as a preschool child with a disability. (*Id.* at ¶ 18.)

On February 13, 2019, Z.P. was assessed by EI services using the Battelle Developmental Inventory – 2nd Edition ("BDI-2"). (*Id.* at ¶ 21.) According to test results, Z.P.'s total communication score on that assessment was at the 5th percentile rank, which was based on an expressive communication score at the 9th percentile rank and a receptive score at the 1st percentile rank. (*Id.* at ¶ 22.) After receiving the report, A.C. provided a copy to the District, and on February 21, 2019, she filed a Request for Mediation/Petition for Due Process, seeking Z.P. to be evaluated by the District to determine his eligibility for Special Education and related services under the categories of "Autistic" or "Speech and Language Impairment." (*Id.* at ¶ 24.) Based on the filing of A.C.'s petition, a meeting between the parties was scheduled, and it was agreed that Z.P. would be evaluated to determine his eligibility for Special Education and related services. As such, the petition was withdrawn without prejudice. (*Id.* at ¶ 24.)

Thereafter, Z.P. underwent a Multidisciplinary Evaluation, including a Speech and Language and Occupational Therapy Evaluation. Based on his performance on these evaluations, however, the District determined on May 24, 2019, that Z.P. did not have a disability that adversely affects his educational performance. (Def. SUMF, ¶ 6.) He was determined ineligible for Special Education and related services at that time. (*Id.*) At the May 24th meeting, however, A.C. also

6

claims that she described a change in Z.P.'s behavior since starting in the preschool class at Bright Horizons—Z.P.'s private daycare/preschool facility. (Pl. SUMF, ¶ 52.) During the District's evaluation of Z.P., he was in the two year old's room. Previously, Z.P. had been eager to go to Bright Horizons, but A.C. purportedly stated that since starting the preschool class, he resisted and refused to get out of the car. (*Id.*) She also explained that he would scream, cry, and try to elope from the school building.[1] (*Id.*)

On May 29, 2019, A.C. filed a second Request for Mediation, asking that the District reevaluate Z.P. because he had transitioned to the preschool class at Bright Horizons. (*Id.* at ¶ 62.) On June 10, 2019, however, A.C. converted her second Request for Mediation to a Petition for Due Process, alleging that the District had violated the IDEA, ADA, and New Jersey state law. The parties agreed to waive mediation and requested the matter be transmitted to the Office of Administrative Law. Prior to a settlement conference scheduled before an administrative law judge initially assigned to the case, the parties also agreed that any hearing in the matter would be postponed while the District observed Z.P. at Bright Horizons. (*Id.* at ¶ 67.) According to A.C., the District did not propose a date for the observation; rather, the CST appeared unexpectedly at Bright Horizons on June 14, 2019, without notice. (*Id.* at ¶ 68.) A.C. maintains that she was amenable to performing the observation that day, but that the District declined after learning that Z.P.'s regular teacher was not present. (*Id.* at ¶ 69.) According to the District, it was "not able to observe [Z.P.], as the parent restricted access to the program." (Def. SUMF, ¶ 8.)

Following the settlement conference, the District observed Z.P. at Bright Horizons on July 11, 2019; on August 8, 2019, after consideration of the evaluation and observation results, the

---

[1]     While the District maintains that it found Z.P. ineligible for special education and related services at the May 24, 2019 meeting, A.C. submits that the District agreed to keep his "status […] open." (Pl. SUMF, ¶ 56.)

District found Z.P. eligible for special education and related services under the classification category of Preschool Child with a Disability. (Pl. SUMF, ¶¶ 74; 92.) The proposed IEP ("August IEP") provided placement for Z.P. in the District's half-day integrated preschool program at Village Elementary School. (*Id.* at ¶ 92.)[2] The District did not find, however, that Z.P. qualified for speech and language services and the half-day integrated class did not have the support of a Board Certified Behavioral Analyst ("BCBA"). (*Id.* at ¶¶ 94; 98.)

Although A.C. consented to Z.P.'s placement in the half-day integrated preschool program, she disagreed with the District's speech-language determination.[3] As a result, the matter was assigned to the ALJ. At a settlement conference on October 1, 2019, the parties agreed that the District would perform an additional speech and language screening of Z.P. within thirty days, to determine if any new issues arose during his first two months in the District's program that might qualify him for speech services. (*Id.* at ¶¶ 126; 135.) Based on the screening, the District determined that further evaluation was necessary, because it appeared that Z.P. was evidencing developmentally-inappropriate skills in the areas of articulation and expressive language. (*Id.* at ¶ 175; Def. SUMF, ¶ 17.) As a result, the District sought parental consent to perform another speech evaluation of Z.P. in those specific areas. (Def. SUMF, ¶ 18.) Shortly thereafter, A.C.'s counsel informed the District that A.C. would not consent to another speech evaluation, and demanded that speech services begin immediately. (*Id.*)

---

[2]     An integrated class consists of students with disabilities being educated with non-disabled peers.
[3]     Z.P. aged out of eligibility for Early Intervention services upon turning three years old in March 2019, thereby losing speech-language and occupational therapy and developmental assistance. As a result, Plaintiff submits that from March 22, 2019 until the date that Z.P. was found eligible for special education, A.C. incurred costs for privately arranged preschool services. (Pl. SUMF, ¶ 101.) Similarly, from March 22, 2019 to the present, A.C. claims that she incurred costs from privately-obtained speech-language therapy through CHOP. (*Id.* at ¶ 102.)

In addition, following the District's speech and language screening, but prior to its determination that a reevaluation was required, Z.P. suffered several behavioral incidents and outbursts at school. (Pl. SUMF, ¶¶ 145-171.) Indeed, during one of these incidents, Z.P. was restrained as he attempted to elope from the school building. (*Id.* at ¶ 148; Def. SUMF, ¶ 20.) According to the District, staff believed that Z.P. was not in control of himself, and therefore, he was potentially a danger to himself and others. (Def. SUMF, ¶ 20.) Following this incident, however, the District claims that Z.P.'s behavior improved "dramatic[ally]," attributing this improvement to Z.P.'s adjustment to the new program and the behavioral support provided by the District. (*Id.* at ¶ 21.)

On November 11, 2019, A.C. filed a request for emergent relief, requesting that the District immediately provide Z.P. with a formal behavioral intervention plan ("BIP"), as well as speech and language services. (*Id.* at ¶ 22.) The District opposed the emergent application, and it cross-moved to compel a new speech-language evaluation. (Pl. SUMF, ¶ 178.) Following oral argument, but before any decision on the motions, A.C. consented to a full speech language reevaluation, which the District agreed to expedite. (*Id.* at ¶ 181.) The parties also agreed to hold an IEP meeting to discuss the issues central to A.C.'s emergent application. (*Id.*) At an IEP meeting on December 16, 2019, the District agreed to add two 20-minute sessions of speech-therapy to Z.P.'s IEP ("December IEP"), but it refused to develop a BIP. (*Id.* at ¶ 183.) According to A.C., while the addition of speech therapy only addressed articulation issues, an updated report dated December 11, 2019, from Z.P.'s speech-language pathologist, stated that Z.P. also required speech-language therapy in the areas of grammatical/morphological complexity, phonological development, improved speech intelligibility, and social communication skills. (*Id.* at ¶ 184.)

On January 30, 2020, A.C. filed an amended petition that asserted six claims against the District, including: (1) demand for a finding that the District's failure to timely and appropriately identify, evaluate, and find Z.P. eligible for special education and related services and to develop and implement an IEP tailored to meet his unique needs no later than his third birthday denied him a FAPE; (2) demand for compensatory education based on the District's failure to find Z.P. eligible for special education and develop an IEP tailored to meet his needs no later than his third birthday, including speech services and behavioral interventions; (3) violation of the IDEA and ADA based on the District's purported failure to provide appropriate transportation to Z.P.; (4) reimbursement for privately-secured preschool and speech services for Z.P. from his third birthday until he was classified; (5) a claim for more specific speech services in Z.P.'s IEP; and (6) a claim for a formal BIP for Z.P. (Def. SUMF, ¶ 24.)

Following several settlement conferences, the ALJ assigned hearing dates of March 18, March 19, April 21, and May 21, 2020. (*Id.* at ¶ 27.) Due to the COVID-19 pandemic, however, the hearing dates in March and April were canceled. (*Id.* at ¶ 28.) The remaining hearing dates were converted to virtual proceedings with the parties' consent. (*Id.*) The hearing commenced virtually on May 21, 2020, and continued on June 15, 17, July 2, 17, 20 and August 7, 2020. (*Id.* at ¶ 29.) The following three witnesses testified on behalf of the District: (1) Dr. Laura Nash, School Psychologist and Case Manager; (2) Amanda Gagnon, a speech therapist; and (3) Kristen Weston, Z.P.'s special education teacher. (*Id.* at ¶ 30.)

Dr. Nash, an expert in special education and school psychologist with a concentration in educating preschool aged students with disabilities, served as Z.P.'s case manager for the 2018-2019 and 2019-2020 school years. (ALJ Decision, 5.) She testified generally about A.C.'s concerns regarding Z.P.'s speech development, but also stated that Z.P.'s Early Intervention records

indicated that he was making progress. (*Id.*) Dr. Nash also testified extensively regarding her observations at the various IEP meetings and multidisciplinary evaluation of Z.P. performed from 2019 to 2020. (*Id.* at 5-17.) She concluded that in her professional opinion, the August 8, 2019 and December 16, 2019 IEPs offered Z.P. a FAPE in a least restrictive environment. (*Id.* at 15.)

Ms. Gagnon, the speech therapist who provided direct services to Z.P. during the 2019-2022 school year, testified as an expert school-based speech therapist. (*Id.* at 17-24.) Among other things, Ms. Gagnon testified regarding her review of the Spring 2019 multidisciplinary evaluation report, her speech and language screening performed in October 2019, the formal speech and language evaluation she performed in December 2019, and the December 16, 2019 IEP. (*Id.*) On cross-examination, Ms. Gagnon testified that she reviewed several reports and/or speech therapy evaluations of Z.P. obtained privately by A.C. from CHOP. (*Id.* at 23-24.) As for these reports and evaluations, Ms. Gagnon explained that Z.P.'s scores on the pre-school language scale were within the average range. (*Id.*) Ms. Gagnon was also questioned as to why some factual information contained her in her draft report was omitted from the final report.[4] (*Id.*) Ms. Gagnon testified that to the extent any omissions were made, that information was not relevant to her speech and language observations and evaluation. (*Id.*) Indeed, Ms. Gagnon stated that anything not included in her final report had no impact on the speech screening that she conducted. (*Id.*)

Ms. Weston, Z.P.'s special education teacher for the 2019-2020 school year, was offered as an expert witness in the area of special education; however, the ALJ reserved on whether to

---

[4]      A.C. claims that the initial draft of Ms. Gagnon's report included her observations related to an incident of "maladaptive behavior" involving Z.P., which she later deleted from the final version of the report following her supervisor's review. (Pl. SUMF, ¶ 145.) Specifically, A.C. maintains that the school nurse was summoned to examine Z.P. for possible injuries suffered during the incident, and that A.C. only learned of the incident when preparing for the due process hearing. (*Id.* at ¶ 146.)

accept her as an expert, because most of her testimony was factual.[5] (*Id.* at 24.) Generally, Ms. Weston testified regarding her initial impressions of Z.P., including that he was a happy student who enjoyed asking questions and speaking with adults; the District's Creative Curriculum and the Early Childhood Environment Rating Scale; and Z.P.'s performance during the 2019-2020 school year. (*Id.* at 24-29.) Overall, Ms. Weston testified that based on the various progress reports and report cards that she completed for Z.P., he was progressing both cognitively and socially. (*Id.*)

Three witnesses also testified on behalf of Plaintiff: (1) Dr. Lindsay Hilsen, BCBA; (2) Debra Levin, a speech therapist; and (3) Dr. Hilsen, a Board Certified Behavioral Analyst, qualified as an expert in special education and Applied Behavioral Analysis ("ABA") in the education of preschool students. (*Id.* at ¶ 31.) Dr. Hilsen testified extensively about her reports, stating that she observed Z.P. for roughly one hour in a school setting. (*Id.* at 29-32.) She further opined that Z.P. should have had a formal behavioral intervention plan, and that the District's decision to observe Z.P. only with adults was inappropriate. (*Id.*) Ms. Levin testified as an expert in diagnosis and intervention as it relates to speech and language pathology. (*Id.* at 32-34.) In that connection, she testified about the evaluations that she completed on Z.P. while working for CHOP and the evaluations completed by the District—despite not being physically present for the District's evaluations. (*Id.*) As for A.C., she testified about her son's disability and needs. (*Id.* at 34-37.) She also provided her opinions about the root of Z.P.'s issues, the evaluation and eligibility process, and Z.P.'s progress in the District. (*Id.*)

---

[5]     I note that the record is unclear whether the ALJ eventually qualified Ms. Weston as an expert witness; however, based on the ALJ's decision, it appears that he mostly relied on Ms. Weston as a fact witness. The Court, here, does the same.

On March 30, 2021, the ALJ issued a decision in favor of the District on five of Plaintiff's six claims. (*Id.* at ¶ 39.) Specifically, the ALJ found that: (1) the District conducted an appropriate identification meeting for Z.P. 120 days prior to his third birthday, resulting in a refusal to conduct an evaluation for eligibility for special education and related services; (2) the evaluation of Z.P. conducted by the District in April 2019, was not flawed and the District correctly found him ineligible for special education and related services; (3) the District did not err in finding Z.P. eligible for special education and related services on August 8, 2020, and that the delay alleged by Plaintiff did not deny Z.P. any educational services; (4) the District did not err in finding Z.P. ineligible for speech-language services as a part of the IEP developed at the August 8, 2019 eligibility determination meeting; and (5) the District did not err in refusing to offer an individual behavior plan for Z.P. during the 2019-2020 school year. (*Id.* at ¶ 40.) As for Plaintiff's sixth claim, the ALJ ordered that the District allow Z.P. to carry his medications for allergies and asthma on the bus. (*Id.* at ¶ 41.)

On June 27, 2021, Plaintiff filed this action, seeking compensatory education from March 22, 2019 through the 2020-2021 school year as a result of the District's alleged continuing denial of a FAPE; reimbursement for speech-language therapy, private preschool programming; and intervention from Board Certified Behavioral Analysts. (ECF No. 1.) A.C. and the District filed their motions for summary judgment on May 11, 2022, while the DOE filed its motion to dismiss on July 6, 2022 (ECF Nos. 44, 45, and 58.)

## II.   <u>STANDARDS OF REVIEW</u>

### A.   <u>Motion to Dismiss</u>

A court may grant a motion to dismiss if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "While a complaint attacked by a Rule 12(b)(6)

motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (stating that standard of review for motion to dismiss does not require courts to accept as true "unsupported conclusions and unwarranted inferences" or "legal conclusion[s] couched as factual allegation[s]") (quotations omitted). Thus, for a complaint to withstand a motion to dismiss under Rule 12(b)(6), the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . ." *Twombly*, 550 U.S. at 555 (citations omitted).

The Supreme Court has emphasized that, when assessing the sufficiency of a civil complaint, a court must distinguish factual contentions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When evaluating a motion to dismiss for failure to state a claim, district courts engage in a three-step progression.

First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 662. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 664. Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* "This means that the inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry

14

are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). A complaint will be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). This "plausibility" determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully;" indeed, mere consistency with liability is insufficient. *Iqbal*, 556 U.S. at 678. Moreover, a plaintiff may not be required to plead every element of a prima facie case, but he must at least make "allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler*, 578 F.3d at 213.

The Third Circuit has reiterated that "judging the sufficiency of a pleading is a context-dependent exercise" and "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010), *cert. denied*, 565 U.S. 817 (2011). Generally, when determining a motion under Rule 12(b)(6), the court may only consider the complaint and its attached exhibits. However, while "a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004) (citation omitted); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

### B.   Motions for Summary Judgment

The standard of review "under which this Court considers an appeal of a state administrative decision under the IDEA differs from that governing the typical review of summary judgment." *M.A. ex rel. G.A. v. Voorhees Tp. Bd. of Educ.,* 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd,* 65 Fed.Appx. 404 (3d Cir. 2003) (internal citations and quotations omitted). To that end, the Third Circuit has instructed district courts to apply a "modified version of de novo review" to cases brought under the IDEA. *Munir v. Pottsville Area Sch. Dist.,* 723 F.3d 423, 430 (3d Cir. 2013). Under this standard, although "the District Court must make its own findings by a preponderance of the evidence, the District Court must also afford 'due weight' to the ALJ's determination." *Mary T. v. Sch. Dist. of Philadelphia,* 575 F.3d 235, 241 (3d Cir. 2009) (citation omitted). "The 'due weight' standard requires the court to consider the factual findings from the administrative proceedings *prima facie* correct and, if the court fails to adopt those findings, it must explain its reasons for departing from them." *Id.* (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.,* 381 F.3d 194, 199 (3d Cir. 2004)) (internal quotations omitted). The purpose of the "due weight" standard is to prevent the courts from imposing their own "view of preferable educational methods on the states." *Rowley,* 458 U.S. at 207. Nonetheless, the district court's review over questions of law and the ALJ's application of legal precepts is plenary. *See Carlisle Area Sch. v. Scott P. By & Through Bess P.,* 62 F.3d 520, 528 n.3 (3d Cir. 1995); *D.B. v. Ocean Twp. Bd. of Educ.,* 985 F. Supp. 457, 500 (D.N.J. 1997), *aff'd,* 159 F.3d 1350 (3d Cir. 1998).

Finally, I note that "[a]fter examining the administrative record and hearing additional evidence at the request of either party, the reviewing court is authorized to grant 'such relief as [it] determines is appropriate' based on the preponderance of the evidence." *Batchelor v. Rose Tree Media Sch. Dist.,* 759 F.3d 266, 272 (3d Cir. 2014) (quoting 20 U.S.C. § 1415(i)(2)(C)); *see also*

*Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 237-38 ("In determining the scope of the relief authorized, ... the ordinary meaning of these words confers broad discretion on the court and ... absent any indication to the contrary, what relief is appropriate must be determined in light of the Act's broad purpose of providing children with disabilities a FAPE[.]" (internal quotations and citation omitted)); *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985) ("The ordinary meaning of these words confers broad discretion on the court. The type of relief is not further specified, except that it must be 'appropriate.' "); *Ferren C. v. Sch. Dist. of Philadelphia*, 612 F.3d 712, 718-19 (3d Cir. 2010) (citing *Forest Grove* and *Burlington* for the proposition that courts have broad discretion to fashion equitable remedies). "These remedies include, *inter alia*, 'attorneys' fees, reimbursement for a private educational placement, and compensatory education.' " *Id.* (quoting *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 185 (3d Cir. 2009)). In addition, the Court may remand the case to the ALJ for findings and conclusions consistent with appropriate credibility determinations; expansion of the record, including taking additional testimony; and consideration of discrete legal issues. *Carlisle*, 62 F.3d at 526 (holding that district court may remand to ALJ for further proceedings); s*ee also N.G. v. N. Valley Reg'l High Sch. Bd. of Educ.*, No. 15-4419, 2017 WL 5515913, at *8 (D.N.J. Mar. 31, 2017) (remanding to the ALJ to expand the record); *R.S. v. Montgomery Twp. Bd. of Educ.*, 10-5265, 2012 WL 2119148, at *7 (D.N.J. June 11, 2012) (remanding to ALJ for reconsideration of prior finding); *L.K. v. Randolph Twp. Bd. of Educ.*, 19-14836, 2021 WL 2177509, at *4 (D.N.J. May 27, 2021) (remanding to ALJ to address the potential applicability of certain IDEA notice exceptions).

## III.   **DISCUSSION**

### A.   **Department of Education's Motion to Dismiss**

At the outset, I consider the DOE's motion to dismiss Count Five of the Amended Complaint. In Count Five, Plaintiff asserts that the DOE violated the IDEA by denying Plaintiff the right to an impartial due process hearing.[6] Specifically, Plaintiff claims that the ALJ lacked qualifications, did not know how to conduct a hearing, and did not possess knowledge of the IDEA.

Under the IDEA, a hearing officer conducting a due process hearing "must not be an employee of the SEA or the LEA involved in the education or care of the child," or "a person having a personal or professional interest that conflicts with the person's objectivity in the hearing." 20 U.S.C. 1415(f)(3)(A). Hearing officers must "possess knowledge of, and the ability to understand, the provisions of [the IDEA], Federal and State regulations pertaining to the IDEA, and legal interpretations of the IDEA." 20 U.S.C. 1415(f)(3)(A). Finally, they must possess the knowledge and ability to conduct hearings and render and write decisions in accordance with appropriate, standard legal practice. 20 U.S.C. 1415(f)(3)(A).

Here, Plaintiff does not allege that the ALJ was biased; that he was an employee of the DOE; that he could not conduct a hearing or write a legal decision in accordance with standard legal practice; or that he did not know how a hearing must proceed, including how witnesses must

---

[6]      In October 2021, the DOE filed a motion to dismiss, which the Court granted in part and denied in part. (ECF No. 42.) The Court granted the DOE's motion to dismiss as to Count Five, finding that the purported legal errors relied on by Plaintiff were insufficient to assert a violation of her right to an impartial due process hearing. (*Id.* at 11-12.) Specifically, the Court noted that Plaintiff did not allege that the ALJ was employed by the State educational agency or local educational agency involved in Z.P.'s education, nor does she allege that the ALJ acted with any bias in deciding her petition. Rather, the Court found that "the basis for Plaintiff's claim in Count Five appears to rest solely on allegations that the ALJ failed to correctly decide the issues underlying the due process hearing," and these allegations concern the ALJ's decision-making and legal judgments, not his experience, knowledge, or understanding of the IDEA. Thus, although the Court commented that it may eventually agree with Plaintiff that the ALJ erred in his Final Decision, the errors, as pled in the Complaint, did not constitute a violation of Plaintiff's right to an impartial hearing. (*Id.* at 10-12.) The Court gave Plaintiff leave to amend the Complaint within thirty days, and in response Plaintiff filed the operative Amended Complaint.

be examined, how to make evidentiary rulings, how to admit or exclude exhibits from evidence, or how to rule on objections. Rather, Plaintiff merely alleges, in conclusory fashion, that "the ALJ's decision and order in this case repeatedly shows that he did not possess the requisite knowledge and understanding of the IDEA and other applicable law and regulations." (Am. Compl., ¶ 384.) She further claims that a "review of the transcripts of the hearings as well as the fact that the ALJ failed to decide two motions for emergent relief made during the pendency of the matter show that the ALJ did not possess the knowledge and ability to conduct the hearing in accordance with appropriate standard legal practice or actions, and NJDOE failed to ensure that he had that knowledge and ability." (*Id.* at ¶ 385.) Lastly, with respect to the ALJ's written decision, Plaintiff alleges that it "does not contain findings of fact and conclusions of law that are based upon 'sufficient, competent and credible evidence' as required by N.J.S.A. 52:14B-10(c)." (*Id.* at ¶ 386.) Even when taken together, the Court finds that these allegations are insufficient to sustain a claim for violation of Plaintiff's right to an impartial due process hearing. Plaintiff provides no allegations regarding the ALJ's educational background, qualifications, work experience, or the nature of the cases he has handled at the New Jersey Office of Administrative Law. Indeed, 20 U.S.C. § 1415(f)(3)(A) is clear that a hearing officer need only have knowledge of the IDEA and have the ability to understand it. The Amended Complaint lacks any allegations that the ALJ had no knowledge about the IDEA or could not understand it. Further, as the Court previously found in this case, allegations that the ALJ incorrectly decided any issues cannot support a claim for violation of Plaintiff's right to an impartial hearing. (ECF Nos. 42 and 43.) Accordingly, the Court grants the DOE's motion to dismiss Count Five of the Amended Complaint.

**B.**     <u>**The District Failed to Properly and Timely Evaluate Z.P.**</u>

Plaintiff's motion for summary judgment challenges the ALJ's decision on two primary grounds: (1) that the District did not properly and timely evaluate Z.P. and (2) that the IEPs provided by the District did not provide a FAPE. In support of these positions, Plaintiff also argues that the District failed to meet its burden of proof and production, and that Plaintiff did not receive an impartial hearing as guaranteed under the IDEA. I address these arguments, in turn.

*1.   Timeliness of Evaluation*

At the outset, Plaintiff argues that the District's failure to timely evaluate Z.P. denied him a FAPE. Plaintiff claims that the District's purported delays, including its first refusal to evaluate Z.P. at the January 15th identification meeting, resulted in Z.P. not receiving special education and related services by his third birthday in accordance with the IDEA and the New Jersey Administrative Code. *See* 20 U.S.C. § 1412(a)(9); 34 C.F.R. § 300.101(b)(1)(i); N.J.A.C. 6A:14-1.1(b)(1); N.J.A.C. 6A:14-3.3(e)(2). Plaintiff further claims that when the District agreed to evaluate Z.P. on March 11, 2020, and A.C. consented to such evaluation, that started the 90-day time-period for the District to complete an evaluation, determine eligibility, and if eligible, develop and implement an IEP. According to Plaintiff, however, when that 90-day period concluded on June 8, 2019, the District had not made an eligibility determination. Rather, the District observed Z.P. at Bright Horizons on July 11, 2010, and on August 8, 2019—four months after Z.P.'s third birthday -- the District found Z.P. eligible for special education and related services under the classification category of Preschool Child with a Disability.

N.J.A.C. 6A:14-3.3(e) provides, in part, that:

(e) When a preschool age or school age student is referred for an initial evaluation to determine eligibility for special education programs and services under this chapter, a meeting of the child study team, the parent, and the regular education teacher of the student who is knowledgeable about the student's educational

performance or, if there is no teacher of the student, a teacher who is knowledgeable about the school district's programs, shall be convened within 20 calendar days (excluding school holidays, but not summer vacation) of receipt of the written request. This group shall determine whether an evaluation is warranted and, if warranted, shall determine the nature and scope of the evaluation pursuant to N.J.A.C. 6A:14–3.4(a). The team may also determine that an evaluation is not warranted and, if so, determine other appropriate action. The parent shall be provided written notice of the determination(s), including a request for consent to evaluate, if an evaluation will be conducted pursuant to N.J.A.C. 6A:14–2.3.

[…]

**2. Preschoolers with disabilities shall have their IEPs implemented no later than age three**. To assure that preschoolers with disabilities have their initial IEPs implemented no later than age three, a written request for initial evaluation shall be forwarded to the district at least 120 days prior to the preschooler attaining age three.

Here, it is undisputed that the August IEP was not implemented prior to Z.P.'s third birthday on March 22, 2019; however, the existence of such a procedural violation does not conclude the inquiry. "A procedural violation of the IDEA is not a *per se* denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE <u>only if such violation causes substantive harm to the child or his parents</u>." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010) (quoting *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir. 2001)); *see also D.S. v. Bayonne Bd. of Education*, No. 08–4730, 602 F.3d 553, 564–67 (3d Cir. 2010) ("A procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits."); *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811–12 (5th Cir. 2003) ( "[P]rocedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity."); *DiBuo v. Bd. of Educ.*, 309 F.3d 184, 190 (4th Cir. 2002) ("[A] violation of a procedural requirement of the IDEA (or one of its implementing

regulations) must actually interfere with the provision of a FAPE."). Under the implementing regulations, substantive harm occurs only if the preponderance of the evidence indicates that

> the procedural inadequacies (i) [i]mpeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit.

34 C.F.R. § 300.513(a)(2).

In this regard, I note that Plaintiff has failed to cite any case law in support of her timeliness argument. Indeed, the Court's independent research demonstrates that scant law exists in the context of such procedural violations involving preschool age children. Nonetheless, I find the reasoning in *MM v. School District of Greenville County*, 303 F.3d 523 (4th Cir. 2002) and *Knable*, 238 F.3d at 766–67 persuasive. In *MM*, a four year-old child ("MM") suffered from a form of dystrophy and mild autism and was enrolled in a public preschool program, receiving special services under the IDEA. 303 F.3d at 528. Her parents also participated in a private in-home program for autism when MM was not in preschool. *Id.* For the 1995–1996 school year, MM had an IEP in place that the parents had approved. *Id.* In May of 1996, the IEP team convened to reassess MM's progress and proposed an IEP that did not include "extended school year" services to cover a summer educational program for MM. *Id.* at 528–29. The parents objected and the IEP was not agreed to for the 1996–1997 school year. *Id.* at 529. A subsequent meeting on August 8 was similarly unsuccessful, in large part because the parents insisted that the in-home autism treatment should be part of the IEP. *Id.* A third meeting was scheduled for August 22, but the parents cancelled the meeting. *Id.* The parents then unilaterally decided to enroll MM in a private kindergarten program, and she never attended classes in the public school district for the 1996–1997 school year. *Id.*

In assessing the parents' claim for reimbursement of MM's private tuition costs, the court considered whether the school district's failure to have an IEP in place before the start of classes "resulted in the loss of an educational opportunity for the disabled child, or whether ... it was a mere technical contravention of the IDEA." *Id.* at 533. Under the facts of that case, the court reasoned that "the District was willing to offer MM a FAPE, and that it had attempted to do so[,]" and that "her parents had a full opportunity to participate in the development of the Proposed 1996–97 IEP." *Id.* at 534. Additionally, there was no evidence that MM suffered any educational loss because her parents "would [not] have accepted any FAPE offered by the District that did not include reimbursement for the [in-home autism] program" and "MM suffered no prejudice from the District's failure to agree to her parents' demands." *Id.* at 535. The court ultimately concluded that "[b]ecause this procedural defect did not result in any lost educational opportunity for MM," the reimbursement claim failed. *Id.* The court further cautioned, "it would be improper to hold [the] School District liable for the procedural violation of failing to have the IEP completed and signed, when that failure was the result of [the parents'] lack of cooperation." *Id.* at 534 (citation omitted).

In *Knable*, on the other hand, the Sixth Circuit held that a "draft" IEP did not satisfy the IDEA and that the school district's failure to formulate a final IEP prior to the start of the school year resulted in a denial of FAPE. However, critical to the Sixth Circuit's analysis was the fact that the school district never convened an IEP meeting, either before or after the start of the school year, and that the disabled student enrolled in the district for the school year and never received an IEP. Thus, the court reasoned, "the absence of an IEP at any time during [the child's] sixth-grade year caused [him] to lose educational opportunity." *Id.* at 766.

Looking at the present circumstances through the lens of *MM* and *Knable*, the timeline leading to the District's eventual eligibility determination on August 8, 2019, as well as its continued communication and evaluation of Z.P. between August 2019 and December 2019, show that the District was responsive, persistent, and attentive to Z.P.'s needs. At the outset, Dr. Nash testified that she was aware of Z.P.'s potential eligibility for special education and related services prior to his aging out of EI. (Nash Dep. Tr., dated May 21, 2020, T31:21 to 25.) Further, after receiving a referral for an eligibility determination for Z.P. in late 2018, Dr. Nash testified that she reviewed Z.P.'s records from EI services and immediately contacted A.C. to coordinate a date for the Initial Evaluation Planning Meeting, which the parties scheduled for January 15, 2019. (*Id.* at T33:14 to 23.) According to Dr. Nash, the only reason the January 15th meeting did not occur sooner was because A.C. had conflicts with earlier dates proposed by Dr. Nash. (*Id.*)

Following the January 15th meeting, the CST did not recommend further evaluation of Z.P. based on Z.P.'s demonstration of age-appropriate skills in the five relevant domains, which include cognition, communication, social and emotional development, adaptive behavior, and motor development. Specifically, Dr. Nash testified that Z.P. had "excellent visual perception skills;" demonstrated age-appropriate communication skills in the "domains of language, interpersonal and articulation skills;" and had a "grasp of information that was appropriate for his age in terms of quantitative knowledge, body parts, interest in books, certainly interest in playing and certainly he made lots of comments about what he was doing." (*Id.* at T46-47.) Dr. Nash also testified that Z.P. followed one-step directions, answered yes-or-no questions, and asked for assistance when needed. Z.P. "safely navigated around the room," used tools, and performed other fine motor tasks adequately. (*Id.*) Notwithstanding the CST's decision to forgo further evaluation, Dr. Nash explained that the CST offered A.C. an application for the Project Child Clinic, a County

based clinic that offers weekly speech therapy. (*Id.* at T47:15 to 21.) According to Dr. Nash, A.C. appeared satisfied with the CST's recommendation not to pursue evaluation at that time. (*Id.* at T47:22 to 48:2.)

Several weeks later, on February 15, 2019, Dr. Nash received an e-mail from A.C. concerning Z.P.'s exit testing from EI services, *i.e.*, his scores related to the communication domain. (*Id.* at T49; Ex. J-12.) Specifically, it is undisputed that on the communication portion of the BDI-2 test, Z.P. scored at the 5th percentile based on his expressive communication score (9th percentile) and receptive score (1st percentile). One workday after receiving Z.P.'s BDI-2 scores from A.C., Dr. Nash requested that the parties schedule a conference call to determine the next steps. (*Id.* at T50; Ex. J-12.)

Approximately three weeks later, on March 11, 2019, the parties met to determine an appropriate evaluation plan for Z.P. based on the newly provided information from A.C. and her continued concerns about Z.P. At this meeting, the CST offered to evaluate Z.P. in the areas of speech and language, psychological, and social. Dr. Nash testified that the CST did not pursue any assessments related to cognitive development, because the evidence, including Z.P.'s "well above-average" scores on the cognitive portion of the BDI-2 test, showed that Z.P. was capable of learning information quickly. (Nash Dep. Tr., dated May 21, 2020, T55:18 to 56:3.) Critically, Dr. Nash also testified that the CST was prepared to evaluate Z.P. on the day of the March 11th meeting; however, the CST was not permitted to do so because the parents' advocate recommended that the evaluations be conducted <u>after</u> Z.P. turned three years old. (*Id.* at T57:13 to 17.) This detail is corroborated by the District's Evaluation Plan Document, which provides that on March 11, 2019, the "Preschool assessment team was ready to evaluate [Z.P.] today but

the parent and advocate do not want evaluations completed today as they want him to be evaluated after the age of 3 years." (Ex. J-87.)

Eventually, between March and April 2019, Z.P. underwent a Multidisciplinary Evaluation, including a Speech and Language and Occupational Therapy Evaluation. Based on his performance on these evaluations, however, the District determined on May 24, 2019, that Z.P. did not have a disability that adversely affected his educational performance. At the May 24th meeting, however, A.C. and her advocate also alerted the District to some new information, including changes in Z.P.'s behavior since starting in the preschool class at Bright Horizons and the fact that he was scheduled for updated private communication and neurodevelopmental evaluations. (Nash Dep. Tr., dated May 21, 2020, T75:2 to 18.) Based on this new information, Dr. Nash testified that the District agreed to observe Z.P. again at Bright Horizons in his new classroom. (*Id.* at T76:10 to 19.) According to Dr. Nash, it was important to the District that it conduct a classroom observation because "eligibility for special education has to have an impact in school." (*Id.*) She explained that "the fact that Z.[P.] had moved into a program that was designed to be appropriate for his age level and was now according to what parent had told us[, that he] was struggling in the new classroom[,] we wanted further information about school impact." (*Id.*) Thus, the parties agreed to reconvene the meeting following this additional observation to discuss eligibility. (Id. at T75:14 to 19.)

On July 11, 2019, Dr. Nash and Michelle Fisher, a learning consultant, conducted the supplemental observation of Z.P. at Bright Horizons. (*Id.* at T79; Ex. J-26.) Dr. Nash testified that this additional social and emotional assessment was necessary to address the continuing concerns of A.C. and Z.P.'s teacher about his performance in the classroom. (*Id.* at T82-84.) On August 8, 2019, after consideration of the evaluation and observation results, the District found Z.P. eligible

for special education and related services under the classification category of Preschool Child with a Disability. The proposed IEP provided placement for Z.P. in the District's half-day integrated preschool program at Village Elementary School.

Reviewing the totality of the timeline, it is clear that the District diligently pursued A.C.'s concerns regarding Z.P., and further, that any delay in the implementation of the August IEP was a product of good faith scheduling conflicts, parental delay, or the District's need to assess and evaluate the stream of additional information, reports, and private evaluations provided by A.C. *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 69 (3d Cir.2010) ("While we do not sanction a school district's failure to provide an IEP for even a *de minimis* period, we decline to hold as a matter of law that any specific period of time without an IEP is a denial of a FAPE in the absence of specific evidence of an educational deprivation."). Indeed, other courts have only found lengthy delays in implementing an IEP actionable. *See Tice v. Botetourt Cnty. Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir. 1990) (delay of six-months); *Knable*, 238 F.3d at 764, 766–67. *Cf. Myles S. v. Montgomery Cnty. Bd. of Educ.*, 824 F.Supp. 1549, 1555 (M.D.Ala. 1993) (delay, which resulted in IEP not being implemented until the second week of school, did not deny substantial educational benefit).

Moreover, I note that the District's involvement with Z.P. did not end after implementation of the August IEP. Indeed, Dr. Nash testified that she maintained frequent contact with Z.P.'s teachers and conducted informal observations of Z.P. in his classroom. (Nash Dep. Tr., dated May 21, 2020, T96:12 to 15.) Also, based on a supplemental speech evaluation performed by Amanda Gagnon, the District's speech and language specialist, the District amended the August IEP on December 16, 2019, to include two 20-minute sessions of speech-therapy. Accordingly, as the ALJ concluded, "[a] review of the evidence reveals that Z.P. progressed in his educational program,

and that the CST <u>regularly monitored and adjusted his program in an ongoing effort to personalize his instruction and address his educational needs</u>. An example being the three IEP meetings at which Z.P. was found not eligible for special education; implementation of the IEP in August 2019; <u>and amending that IEP for implementation of speech therapy in the December 2019 IEP</u>." (ALJ Decision, 49) (emphasis added). Therefore, I find that the ALJ appropriately concluded that the District was responsive and acted appropriately relative to Z.P.'s education, and there was no compelling evidence presented to the contrary that supports Plaintiff's position that the District violated its Child-Find obligations.[7]

### 2. Improper Evaluation

Plaintiff also takes issue with the District's substantive evaluation process, arguing that (1) the District should have observed Z.P. with his peers in January 2019, when it refused to conduct further evaluation, and (2) the District never performed a sensory evaluation.[8] I will address these arguments, in turn.

The regulations provide the scope of assessment: "The child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities." 34 C.F.R. § 300.304(c)(4). The New Jersey statute adds that the evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the suspected eligibility category." N.J.A.C. 6A:14–2.5(b)(7).

---

[7]    While the Court finds the District's delay insufficient, this procedural violation is of minimal concern, given the Court decision, *supra*, that Z.P. should have received an IEP on March 22, 2019.

[8]    To the extent that Plaintiff also argues that the District "ignored or disregarded the behavioral observations of CHOP's Developmental and Behavioral Pediatrics' evaluation team that described maladaptive behaviors in Z.P.'s play skills, communication, and social engagement," and that the District improperly performed only a preschool language screening of Z.P., the Court finds that those arguments challenge the sufficiency and adequacy of the IEPs. As such those arguments will be considered in detail, *infra*.

First, Plaintiff argues that, despite Z.P.'s autism diagnosis prior to the January 15, 2019 identification meeting, the District based its decision not to conduct a comprehensive evaluation only on observations of Z.P. interacting with adults—something that Plaintiff claims he "thrives" on. However, Plaintiff conspicuously provides no legal support for this cursory argument. Rather, she merely argues, without any non-testimonial evidence in support, that autism is a "developmental disability characterized by impairment in social interaction among other areas, in order to properly determine whether he should be evaluated," and therefore, the District should have observed him with his peers before determining that further evaluation was unnecessary. The Court cannot accept this conclusory and unsupported argument—especially in light of Dr. Hilsen's concession that she "was not aware that the New Jersey administrative code does not require a student to be evaluated with peers as part of an initial determination of eligibility for special education related services." (Hilsen Dep. Tr., dated July 2, 2020, T131:23 to 132:10.) Moreover, Plaintiff provides no evidence that any further evaluation would have produced different results. Thus, this argument is unpersuasive.

Plaintiff also argues that the District's evaluation was improper because it failed to conduct a sensory assessment of Z.P., despite A.C.'s express request. Here, I agree with Plaintiff's position, and note that the ALJ's decision does not mention Plaintiff's concerns related to Z.P.'s sensory needs, nor does the ALJ address the District's decision to ignore her repeated requests for a sensory evaluation. The IDEA's implementing regulations define autism as follows:

> a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, **and unusual responses to sensory experiences**.

34 C.F.R. § 300.8(a)(2)(i).

It is undisputed that prior to the District's initial identification meeting in January 2019, Z.P. had been diagnosed with autism. In addition, the record is replete with unrebutted testimonial examples from Plaintiff's expert witness, Dr. Hilsen, that Z.P. had sensory issues and reacted negatively to certain stimulation. For example, Dr. Hilsen testified that on one occasion, she observed Z.P.'s lack of body awareness—a sign of sensory issues resulting from overstimulation. (Hilsen Dep. Tr., dated July 2, 2020, T71:8 to 73:17.) She explained that during her observation of Z.P., he participated in a group sing along of "Head, Shoulders, Knees and Toes." (*Id.*) However, while the other children in the class demonstrated body awareness by standing in their space, Z.P. was not "in control." (*Id.* at T72:4 to 9.) Instead, Dr. Hilsen observed Z.P. "bumping into kids, not purposefully, but just because he was in sensory over stimulation." (*Id.* at T71:20 to 72:3.) It is also undisputed that the District's occupational therapist[9] evaluated Z.P. on April 5, 2019; however, for some unexplained and unknown reason, the therapist never performed a sensory processing assessment. Rather, the occupational therapist, who did not attend the August IEP meeting nor testify at the due process hearing, only performed an evaluation of Z.P.'s motor skills. The Court finds this evaluation puzzling given that the record seems to suggest that throughout the evaluation process, both Plaintiff and the District agreed that Z.P. did not suffer from any noticeable deficiencies in his fine motor skills.

Because the District was required to assess Z.P. in "**all** areas" related to his autism, and its evaluation needed to be "sufficiently comprehensive to identify all of [Z.P.]'s special education and related services needs," the Court finds that the District improperly evaluated Z.P. by not

---

[9]     It is undisputed in the record that an occupational therapist would be the appropriate professional to conduct the sensory assessment.

conducting at least some formal sensory assessment.[10] Accordingly, because the record is sparse with respect to Z.P.'s potential sensory needs, I remand this case to the ALJ for further development on this issue, including but not limited to, directing the District to conduct a sensory evaluation of Z.P. The ALJ should also determine whether Z.P.'s IEPs should be amended appropriately. As for compensatory education, the ALJ must determine whether Z.P. required sensory services during the relevant period, and if so, whether compensatory education is appropriate in light of any services that A.C. privately obtained.

C.     **The August and December IEPs**

Plaintiff also argues that the District's August and December IEPs, which placed Z.P. in an integrated half-day preschool class and added certain speech and language therapy, respectively, did not provide Z.P. with a FAPE. To be clear, the half-day class provided for in the August IEP included both disabled and nondisabled students. The August IEP also did not provide any speech-language therapy services based on the District's determination that Z.P. did not meet the criteria for those services following its evaluation in March and April 2019. On the other hand, the December IEP amended the August IEP to include two 20-minute sessions of speech therapy.

Here, Plaintiff's arguments related to the deficiencies of the August and December IEPs are the same: (1) refusal to provide a formal BIP, (2) failure to provide more robust speech and language services, and (3) a lack of attention to Z.P.'s safe transportation needs and the length of school day. Because Plaintiff's deficiency arguments are consistent for both the August and December IEPs, I will address her concerns about the two IEPs together, based on the nature of the purported deficiency.

---

[10]     Compounding this error further, the record suggests that A.C. was never provided an explanation as to why such an assessment was not completed despite her numerous requests—including a written request.

The Third Circuit has held that an IEP "must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *Shore Reg'l High Sch. Bd. of Educ.*, 381 F.3d at 198 (internal quotation marks & citations omitted). "Under 20 U.S.C. § 1412(5), children must also be educated in the least restrictive environment"— the "mainstreaming" provision mentioned above, which establishes a statutory preference for placement of a child in a regular educational setting when possible. *Id.*

### Speech-Language Therapy

First, as to the IEPs' purported speech-language shortcomings, Plaintiff relies exclusively on the testimony of Debra Levin, Z.P.'s treating speech-language pathologist. In this regard, Plaintiff claims that Ms. Levin testified that based on her review of Z.P.'s December 2018 speech-language evaluation from CHOP, as well as her conversation with the therapist who conducted the evaluation, Z.P. should receive school-based speech services when he turned three years old. In addition, Plaintiff cites Ms. Levin's testimony regarding Z.P.'s speech-language abilities, in which she described Z.P. as having "splinter skills." (Levin Dep. Tr., dated August 7, 2020, T27:19 to 28:12.) According to Ms. Levin, while Z.P. has extraordinarily strong abilities in letter, color, and shape identification and an unusual interest in print, he also demonstrates weak functional and social language skills. (*Id.* at 27:19 to 28:4.) Plaintiff also points to Ms. Levin's testimony that Z.P.'s phonological disorder puts him at a high risk for literacy impairment, and an obvious impact on his learning development. Even more specifically, Plaintiff argues that the ALJ overlooked Ms. Gagnon's deletion of "large parts of her October 16, 2019 observation of Z.P." Finally, as to the December IEP in particular, Plaintiff claims that the speech and language services did not extend far enough. Rather, according to Plaintiff, the ALJ ignored Ms. Levin's recommendation that in addition to articulation therapy, Z.P. also required therapy for grammatical/morphological and

social communication issues. Thus, based on Ms. Levin's testimony that these other speech skills were not skills Z.P. could acquire on his own, the District's continued refusal to provide sufficient speech-language services denied him a FAPE.

Here, at the outset, sufficient evidence exists in the record to support the ALJ's finding that Z.P. did not require speech-language services when the District found him eligible for special education and implemented the August IEP. In reaching this conclusion, the ALJ credited the testimony of Dr. Nash and Ms. Gagnon, whom he found credible based on their functional in-person observations and experience with Z.P. in a school setting. Specifically, Ms. Gagnon and Dr. Nash testified that Z.P.'s communication abilities improved between February 13, 2019, when EI services conducted its formal exit assessment, and April 3, 2019, when the District conducted its first evaluation. Ms. Gagnon testified that during the District's April 2019 evaluation, Z.P. scored within the average range of development in the areas of receptive language, expressive language, and overall spoken language. (Gagnon Dep. Tr., dated June 15, 2020, T140:14 to 18.) She explained that these, taken together, "paint a picture of average understanding and expression of language." (*Id.* at T141:21 to 25.) Ms. Gagnon also testified that according to JoAnne Hyman, a speech language specialist with the District, Z.P. was producing all of the sounds that were customarily required by the age of three. (*Id.* at T142:14 to 19).

Next, the Court also finds sufficient evidence in the record to support the ALJ's finding that the December IEP included appropriate speech-language services to provide a FAPE. In this regard, the record clearly establishes that by October 2019, when the District conducted its additional speech screening of Z.P., his skills had declined compared to the District's January 2019 and April 2019 assessments. Thus, there is no dispute that at that time, a certain amount of speech-language services were necessary. As to the scope and nature of those services, however, the ALJ

credited the testimony of Ms. Gagnon regarding her three firsthand, classroom observations of Z.P. on October 7, 16, and 23, 2019, as well as her more comprehensive language evaluation of Z.P. conducted in December 2019. According to Ms. Gagnon, she recommended small group speech therapy twice per week for twenty minutes, along with individual consultations twice per year, based on the severity of Z.P.'s speech deficits. (*Id.* at T161:24 to 162:9.) In that connection, Ms. Gagnon commented that her in-person observations of Z.P. were consistent with the skills of a student of his age, including that he was producing all of the sounds expected by three years old. (*Id.* at T148.) Thus, Ms. Gagnon testified that for articulation and phonological deficits, as was the case here, she typically provides services anywhere between one time a week and three times a week—one time per week for mild cases and three times per week for more severe cases. (*Id.* at T161:24 to 162:9.) Because, in Ms. Gagnon's assessment "there were really only a few things that were appropriate to work on," she recommended therapy sessions twice per week. (*Id.*)

Critically, despite Plaintiff's representations that non-testimonial evidence supports her position that the August and December IEPs were deficient, the Court finds that Plaintiff's briefing only relies on conflicting testimony offered by Z.P.'s treating speech-language therapist. *Shore Reg'l High Sch. Bd. of Educ.*, 381 F.3d at 199 (finding that a district court "must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.'") (quoting *Carlisle*, 62 F.3d at 529) (emphasis in original). As for Ms. Levin's testimony, the Court cannot overlook the fact that she only testified regarding her own, private evaluations and weekly interactions with Z.P. in a clinical setting. It is undisputed that although she testified regarding the District's evaluations, she was not physically present for these assessments, nor was she present for any of the IEP or eligibility meetings. Indeed, the ALJ noted that Ms. Levin had limited recent experience in a school environment, given that the last

time she worked in a school was approximately twenty-two years ago. (ALJ Decision, 33.) Significantly, Ms. Levin also testified that she has no familiarity with the New Jersey Administrative Code's eligibility requirements for students with disabilities seeking speech and language services. (*Id.*)

Regardless, even considering the substance of Ms. Levin's testimony, I do not find support for Plaintiff's position that the IEPs were deficient, because they lacked appropriate speech-language services. First, despite Plaintiff's repeated insistence that autistic children, like Z.P., must be observed and evaluated with their peers because they sometimes identify and communicate better with adults, Ms. Levin never observed Z.P. with his peers. Rather, as explained *infra*, Ms. Levin's observations were limited to only the interactions between Z.P. and his mother and herself. As such, Ms. Levin could not substantially opine on Z.P.'s ability to converse with other children. In addition, and most importantly, Ms. Levin's own June 12, 2019 report, drafted just two months prior to the August IEP, did not recommend school-based speech therapy for Z.P. (Levin Dep. Tr., dated August 7, 2020, T95-96; Ex. J-25.) And, although she did recommend speech-language services two months later in August 2019, her testimony indicates that she relied heavily on parent reporting in modifying her June 2019 recommendation. (*Id.*) Similarly, to the extent that Plaintiff argues that the December IEP was deficient based on Ms. Levin's opinion that Z.P. also needed therapy for grammatical/morphological and social communication issues, I defer to the ALJ's decision applying greater weight to Ms. Gagnon's testimony, given that Ms. Levin never observed Z.P. in a school setting.

Thus, I find the evidence in the record supports the ALJ's finding that the IEPs adequately addressed Z.P.'s speech-language needs at the time.

**Lack of a Behavioral Intervention Plan**

Plaintiff next argues that the IEPs failed to address Z.P.'s behavioral issues by not implementing a formal BIP. Relying on the testimony of Dr. Hilsen, a Board Certified Behavioral Analyst, Plaintiff claims that Z.P.'s maladaptive behaviors escalated through the fall of 2019, and continued throughout the winter. Specifically, Plaintiff highlights Dr. Hilsen's testimony regarding when a BIP is appropriate. According to Hilsen, a BIP is needed, "[a]ny time a child was exhibiting behaviors that weren't typical or that lasted more than a couple of days or that had an impact on the safety of anybody else in the classroom or themselves…." (Hilsen Dep. Tr., dated July 2, 2020, T11:18 to 22.) She also added that, in her opinion, when staff observe an undesirable behavior occurring for two or three days over a week or two span, a BIP is necessary. (*Id.* at T11:22 to 12:3.) In that regard, Plaintiff claims that the ALJ did not appreciate the seriousness, including the intensity and duration, of Z.P.'s more "extreme behaviors" in and around October 2019. According to Dr. Hilsen, these extreme behavioral events are not typical of a preschool-aged child transitioning to a new environment as the District claimed. Lastly, Plaintiff cites Dr. Hilsen's testimony that the District's behavior logs, which it sent to A.C. on a weekly basis to summarize Z.P.'s behavioral incidents, were inadequate based on poor data collection techniques. Dr. Hilsen testified that the logs focused on the wrong aspects of the behavioral incidents, like duration, when they should have concentrated on frequency. Moreover, A.C. testified that the logs improperly failed to include incidents that occurred during dismissal from school, which A.C. observed firsthand. (A.C. Dep. Tr., dated July 17, 2020, T:249:7 to 9.)

Here, as a threshold matter, the Court notes that Plaintiff's arguments related to the IEPs' lack of a formal BIP are limited only to the December IEP. While the August IEP did not contain

a formal BIP, Plaintiff relies only on maladaptive behavior and incidents that occurred after August 2019 in support of their position that the IEPs should have contained a BIP.

Substantively, Plaintiff's arguments fail to take into account that both the August IEP and December IEP provided specific behavioral modifications that Z.P.'s teachers implemented in the classroom. These modifications included giving Z.P. choices to allow control, encouraging Z.P. to self-advocate, monitoring for overload and excessive stimuli, providing positive reinforcement, using a consistent daily routine, providing modeling, and using interest to increase motivation. (Exs. J-30; J-57.) In finding the IEPs sufficient, the ALJ referenced these modifications, as well as testimony from the District's witnesses that Z.P.'s behavior was not "significantly interfering with his own or other students' learning," and further, that he was responding "very well to the District's modifications." (ALJ Decision, 14.) Specifically, the ALJ noted Dr. Nash's testimony that at the December 18, 2019 meeting, the District had an extensive discussion with A.C. regarding Z.P.'s behavior and A.C.'s request for a formal BIP. (*Id.*) Dr. Nash explained that at the meeting, Z.P.'s teacher provided anecdotal evidence that Z.P.'s behavior had been improving in a school setting, and that in that connection, incidents of Z.P. refusing to do certain tasks or crying excessively diminished within the months following implementation of the August IEP. (Nash Dep. Tr., dated May 21, 2020, T108:19 to 109:12.)

Moreover, the Court also finds the testimony of Z.P.'s teacher, Ms. Weston, compelling. Ms. Weston explained that at the beginning of the school year, immediately following the implementation of the August IEP, Z.P. had documented issues transitioning to the new classroom, including having tantrums, crying, task refusal, and avoidance. (ALJ Decision, 28.) That said, Ms. Weston testified about the class-wide modifications to the curriculum and environment that eased Z.P.'s transition and resulted in improved behavior. (Weston Dep. Tr., dated June 19, 2020, T24-

27.) These modifications included a focus on developing coping skills, the use of "feeling words," and the incorporation of certain visuals in the classroom that reminded students to take deep breaths. (*Id.* at 24:5 to 10.) Ms. Weston testified that she also added a "feelings chart" to the classroom where students had the ability to pick out visual descriptions of certain feelings and display them on a board. (*Id.* at 24:11 to 15.) According to Ms. Weston, the feelings chart was something that Z.P. particularly enjoyed and at which he excelled. (*Id.*) She testified that because of these changes, and the behavioral modifications outlined in the August IEP, Z.P. spent more time interacting with his peers and developed critical coping mechanisms. (*Id.* at T25:1 to 26:10.) Indeed, she testified that while Z.P. began the school year exhibiting maladaptive behaviors, the intensity, frequency, and duration of those incidents improved throughout the year—a point that Plaintiff's own special education expert, Dr. Hilsen, could not dispute. (*Id.*) In that regard, Ms. Weston explained that in the beginning of the school year, Z.P. was more aggressive, *i.e.*, hitting, kicking, pushing, yelling, and throwing objects, and that his outbursts often lasted for more than ten minutes. (*Id.* at T38:8 to 16.) However, following implementation of the August IEP, Ms. Weston's observations, as well as the District's objective data,[11] demonstrated a marked difference in Z.P.'s behavior beginning in November 2019, such as a reduction in the duration and intensity of the incidents. (*Id.* at T41:19 to 43:17.)

Thus, the relevant evidence in the record supports the ALJ's finding that the District's IEPs appropriately addressed Z.P.'s behavior issues.

---

[11]   I note that Plaintiff primarily challenges the District's objective data and data collection methodology, based on her own anecdotal evidence. The ALJ found the District's data sufficient and consistent, and the Court, without any cogent contra evidence, cannot find any reason to question that the collected data was somehow not credible.

**Transportation and Length of School Day**

Finally, Plaintiff argues that the IEPs' failure to provide safe transportation and a length of school day that accommodated Z.P.'s unique needs deprived him of a FAPE. With respect to transportation, Plaintiffs' initial August IEP provides for transportation with an aide accompanying Z.P. on the bus as a related service. However, Plaintiff takes issue with the District prohibiting Z.P. from carrying certain medications on the bus and not providing an appropriately trained designee on the bus to administer those medicines. Specifically, Plaintiff contends that Z.P. has life-threatening food allergies and severe asthma that requires him to carry epinephrine. According to Plaintiff, however, A.C. was informed by the school nurse at an orientation in September 2019, prior to the opening of school, that carrying the epinephrine on the bus was, "against district policy," because Z.P. was too young to self-administer the medication. Plaintiff submits that the nurse did not offer any alternative, including having a nurse or other appropriately trained designee on the bus to administer the epinephrine as required by state law. Rather, Plaintiff maintains that the nurse merely informed Z.P.'s bus drivers of his allergies and the school's transportation coordinator advised the drivers of the protocol in case of an allergic reaction.

Here, while the ALJ directed the District to make a determination as to whether Z.P. is permitted to carry his medications for life-threatening allergies and asthma on the bus, the ALJ did so only to the extent that "this issue has not been adequately dealt with by the district and a revised analysis of Z.P.'s diagnosis of allergy and asthma [ ] be re-undertaken to determine his appropriate transportation needs." (ALJ Decision, 51.) I disagree with the ALJ's reasoning that the record is unclear as to Z.P.'s specific allergies and need for medication while on the bus. First, it is uncontested that Z.P.'s IEPs provide for transportation services, *i.e.*, that Z.P. is entitled to the assistance of an aide on the bus in connection with his propensity for elopement. While the

Transportation Needs form, which was completed on August 20, 2019, and provided to the District's Transportation Department, does not indicate that Z.P. suffers from any allergies, nor does it mention his need for medication, Dr. Nash testified that A.C.'s main concerns at the August IEP meeting were the impact of Z.P.'s sleep disorder, the child's pragmatic language skills, and his allergies. (Nash Dep. Tr., dated May 21, 2020, T89:21 to 90:19.)

Indeed, the record is clear that the District had knowledge of Z.P.'s allergies prior to the August IEP meeting. On July 24, 2019, A.C.'s counsel sent the District an Allergy Action Plan developed for Z.P. by Rahul Datta, M.D., of CHOP's Division of Allergy and Immunology. (Ex. J-62.) According to the Allergy Action Plan, Z.P. has "severe" allergies to egg and peanut, which would present with severe swelling of the skin; tongue swelling; tightness, trouble speaking, and difficulty breathing; coughing and wheezing; repeated vomiting; weal pulse; and loss of consciousness. (*Id.*) The Action Plan further explains that should Z.P. develop any signs of severe reaction or anaphylaxis, he should immediately be given EpiPen Jr. or Auvi-Q, and that an epinephrine auto-injector must be "available at all times." (*Id.*) Therefore, both testimonial and non-testimonial evidence in the record demonstrate that the District had more than sufficient information to resolve Plaintiff's request. To be clear, the Allergy Action Plan provided notice of Z.P.'s allergies, and more importantly, it included Dr. Datta's recommendations, including that Z.P. needed access to his medications on the bus.[12] Moreover, when the District requested more specific information from Plaintiff on February 7, 2020, A.C. provided the District with an updated note from Dr. Datta on February 12, 2020, which reiterated that Z.P. needs an epi-pen and albuterol

---

[12]    The Court notes that A.C.'s failure to follow-up or make any additional requests between her conversation with the school nurse in August 2019 and January 2020, is insignificant. The District was aware of Z.P.'s allergies, the August IEP provided for transportations services, and the District failed to provide safe transportation. The parent need not regularly follow-up with the District in order to preserve any potential future claim under the IDEA or other law.

to treat a potential anaphylactic reaction on the bus. (Ex. J-67.) Accordingly, the Court directs the District to amend Z.P.'s IEPs to include that he be permitted to carry his allergy medication on the bus, and further, that he be entitled to the assistance of an aide on the bus appropriately trained to administer the epinephrine and his inhaler. As Z.P. suffered no injuries because of this error, an award of compensatory education is not necessary.

As for the length of the school day, Plaintiff argues that the ALJ's decision was incorrect because he, and the District, ignored the recommendations by Z.P.'s treating neurodevelopmental pediatrician, Dr. Bennett, that Z.P. required a full-time integrated preschool program. (*See* Ex. J-24.) Plaintiff contends that "[t]here is no indication in Z.P.'s IEP[s] that the district even considered Dr. Bennett's recommendation." A.C. also refers to the New Jersey Department of Education's guide to Autism Program Quality Indicators, ("APQI"), which recommends that "[e]ducational services for preschool students with autism should include a minimum of 25 hour a week and an extended school year program of 210 days per year."

I disagree with Plaintiff's position. The standard is not whether the District or the ALJ considered Dr. Bennett's recommendation, but whether the District's decision to provide only a half-day program denied Z.P. the right to a FAPE. In that regard, Plaintiff does not sufficiently demonstrate such a connection. Indeed, with respect to placement in a full-time program, Dr. Bennett's letter, dated June 6, 2019, simply states that she "[r]ecommend[s] a full time inclusion classroom that includes both typically developing students and students with special education needs to help provide social role models while giving needed support. These classrooms typically include a special education teacher." (Ex. J-24.) Dr. Bennett's letter does not provide any specific support for her recommendation, nor does she explain how a part-time, fully integrated program, like the one implemented by the District, is insufficient to meet Z.P.'s needs.

Moreover, Dr. Bennett did not provide any testimony at the due process hearing. As such, the Court finds limited evidence exists in the record to overturn the ALJ's reliance on Dr. Nash's testimony regarding this issue. Dr. Nash testified that the District's integrated half-day program was consistent with what the District offered for tuition students and exceeded the preschool program requirements as set forth in the New Jersey Special Education Code. (Nash Dep. Tr., dated May 21, 2020, T87:4 to 88:20.) Dr. Nash further explained that the program was selected for Z.P. because he exhibited strong cognitive development and the CST determined that it was appropriate for Z.P. to participate in the general education preschool, with the support of the special education teacher and other accommodations and modifications of the IEPs. (*Id.*) To the extent that Plaintiff claims that the District's witnesses were unfamiliar with the legal requirements for educating a disabled student, that assertion is inconsistent with the ALJ's findings and the hearing testimony. Finally, the record does not suggest that Z.P.'s placement in the half-day integrated program was met with any objection from A.C. at the time of the District's recommendation; rather, A.C. consented to the August IEP, disputing only the IEPs failure to provide for speech-language services. (Pl. SUMF, ¶ 100.) Accordingly, I find that the ALJ's decision, in this context, is supported by the evidence in the record.

### D.    March 22, 2019 to August 8, 2019

Finally, I turn to the District's failure to find Z.P. eligible for special education between March 22, 2019—when Z.P. aged out of EI services—and August 8, 2019—when the District first granted him an IEP. According to N.J.A.C. 6A:14-3.5(c)(10), "Preschool child with a disability" means:

a child between the ages of three and five who **either**:

i. Is experiencing developmental delay, as measured by appropriate diagnostic instruments and procedures, in one or more of the areas in (c)10i(1) through (5)

42

below, and requires special education and related services. As measured by a standardized assessment or criterion-referenced measure to determine eligibility, a developmental delay shall mean a 33 percent delay in one developmental area, or a 25 percent delay in two or more developmental areas.

> (1) Physical, including gross motor, fine motor, and sensory (vision and hearing);
> (2) Intellectual;
> (3) Communication;
> (4) Social and emotional; and
> (5) Adaptive; **or**

> ii. **Has an identified disabling condition, including vision or hearing, that adversely affects learning or development and who requires special education and related services**.

Thus, based on the plain meaning of this Code provision, there are two ways that a preschool-aged child could qualify for special education: (1) if the student demonstrates a development delay as measured by diagnostic instruments and procedures or (2) if the student has an identified disabling condition.

None of the parties, nor the ALJ gave any consideration to subsection (ii). Rather, the focus of the evidence, including the witness testimony, and the ALJ's decision appear to be on whether Z.P. met the standard set forth in subsection (i). While the term "identified disabling condition" is not defined in the Code, N.J.A.C. 6A:14-3.5 expressly provides that autism is a "developmental disability." N.J.A.C. 6A:14-3.5(c)(2). Specifically, the Code provides that autism is a "pervasive developmental disability that significantly impacts verbal and nonverbal communication and social interaction that adversely affects a student's educational performance." *Id.* Indeed, the Code also provides that "[o]nset [of autism] is generally evident before age three," and diagnosis requires an assessment by a certified speech-language specialist and an assessment by a physician trained in neurodevelopmental assessment. *Id.* Here, it is undisputed that Z.P. was diagnosed with autism in December 2018—one month before the first meeting with the District in January 2019. It is also

undisputed that at the time of the January 15th identification meeting, Z.P. had obtained assessments from CHOP by a certified speech-language specialist and a physician trained in neurodevelopmental assessment confirming his autism diagnosis. Critically, the District does not appear to challenge either the accuracy or reliability of Z.P.'s diagnosis or the CHOP assessments. Thus, while neither party, nor the ALJ, provide adequate discussion of N.J.A.C. 6A:14-3.5(c)(10), the Court is confident that based on Z.P.'s autism diagnosis in December 2019, he was entitled to special education from March 22, 2019 to August 8, 2019. The Court, however, is unable to determine the scope and nature of that IEP based on the limited record, and therefore, I order the case be remanded to the ALJ for a determination regarding the extent of compensatory education appropriate between March 22, 2019 and August 8, 2019.

### E.   Attorney's Fees

A prevailing party is entitled to seek attorney's fees and costs pursuant to Section 1415(i)(3)(B) of the IDEA:

> In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs—
>
> (i) to a prevailing party who is the parent of a child with a disability....

20 U.S.C. § 1415(i)(3)(B); *see also* 34 C.F.R. § 300.517(a). For a party to qualify as a "prevailing party," they must "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *John T. v. Del. County Intermediate Unit*, 318 F.3d 545, 555 (3d Cir.2003) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

The Third Circuit employs a two-part test in determining whether a plaintiff qualifies as a "prevailing party": (1) the plaintiff must have achieved relief; and (2) there must be a causal connection between the litigation and the relief obtained. *Wheeler v. Towanda Area Sch. Dist.*, 950 F.2d 128, 31 (3d Cir.1991). Courts are to consider a liberal standard under the first prong, making

a "commonsense comparison between the relief sought and obtained." *Id.* There is no requirement that all relief requested be granted to a prevailing party, just "some of the benefit sought in a lawsuit, [and] even though the plaintiff does not ultimately succeed in securing a favorable judgment, the plaintiff can be considered the prevailing party for purposes of a fee award." *Id.*

Under the second prong, requiring a causal connection between the litigation and the relief from the defendant, a plaintiff must demonstrate that the litigation "changed the legal relations of the parties such that defendants were legally compelled to grant relief" or was a "material contributing factor in bringing about extrajudicial relief." *Wheeler*. 950 F.2d at 132; *see also Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992) (stating that a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff). Where such a change has occurred, "the degree of the plaintiff's overall success goes to the reasonableness of the award ... not to the availability of a fee award *vel non*." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93 (1989).

Here, given the Court's rulings, *supra*, that the District failed to conduct a sensory evaluation of Z.P. contrary to 34 C.F.R. § 300.304(c)(4); that Z.P. was entitled to an IEP between March 22, 2019 and August 8, 2019, pursuant to N.J.A.C. 6A:14-3.5(c)(10)(ii); and that the District must amend Z.P.'s IEPs as it relates to his transportation needs, Plaintiff is entitled to attorney's fees as a prevailing party. Accordingly, the Court grants Plaintiff's request for attorney's fees under the IDEA. Plaintiff may submit a request for attorney's fees that complies with Local Civil Rule 54.2 for the Court's consideration.

**IV.**   <u>**CONCLUSION**</u>

For the reasons set forth above, the DOE's motion to dismiss is **GRANTED**, and Count Five is dismissed; the District's Motion for Summary Judgment is **GRANTED** in part, and **DENIED** in part; and Plaintiffs' Motion for Summary Judgment is **GRANTED** in part, and **DENIED** in part. Specifically, the Court remands this matter for: (1) further proceedings related to Z.P.'s sensory issues; (2) amendment of Z.P.'s IEP to include that he be permitted to carry his allergy medication on the bus, and further, that he be entitled to the assistance of an aide on the bus appropriately trained to administer the epinephrine and his inhaler; and (3) a determination by the ALJ regarding the extent of compensatory education appropriate between March 22, 2019 and August 8, 2019, based on the Court's finding that Z.P. was entitled to special education for that period under N.J.A.C. 6A:14-3.5(c)(10)(ii). All other determinations made by the ALJ are **AFFIRMED**.

Dated: November 30, 2022                                  /s/ Freda L. Wolfson
                                                         Freda L. Wolfson
                                                         U.S. Chief District Judge